Argued and submitted June 13, 2012; resubmitted January 7, decision of Court of
Appeals and judgment of circuit court affirmed December 12, 2013

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## BRUCE LYNN PIPKIN,
*Petitioner on Review.*

(CC 200904318; CA A142469; SC S059769)

316 P3d 255

Susan Fair Drake, Deputy Public Defender, Office of
Public Defense Services, Salem, argued the cause and filed
the brief for petitioner on review. With her on the brief was
Peter Gartlan, Chief Defender.

Jamie K. Contreras, Assistant Attorney General, Salem,
argued the cause and filed the brief for respondent on
review. With her on the brief were John R. Kroger, Attorney
General, and Anna M. Joyce, Solicitor General.

KISTLER, J.

**KISTLER, J.**

Defendant was charged with first-degree burglary, which occurs when a person "enters or remains unlawfully" in a dwelling "with an intent to commit a crime therein." *See* ORS 164.225; ORS 164.215. At trial, defendant argued that the state should be required to elect whether it intended to proceed on the theory that he entered the victim's home unlawfully or on the theory that he remained in her home unlawfully. Alternatively, relying on *State v. Boots*, 308 Or 371, 780 P2d 725 (1989), *cert den*, 510 US 1013 (1993), defendant requested an instruction that at least 10 jurors had to agree on one (or both) of those theories. The trial court denied both requests, and the Court of Appeals upheld the trial court's rulings. *State v. Pipkin*, 245 Or App 73, 80, 261 P3d 60 (2011). We allowed defendant's petition for review and now affirm the Court of Appeals decision and the trial court's judgment.

The indictment in this case alleged that, on or about a specific date, defendant "did unlawfully and knowingly enter or remain" in the victim's home with an intent to commit a crime therein. At trial, the evidence permitted the jury to find that defendant had entered the victim's home unlawfully. It also permitted the jury to find that defendant had entered the victim's home lawfully but had remained there unlawfully after the victim told him to leave. Finally, there was evidence that defendant intended to commit the crime of menacing or harassment when he entered the victim's home and also when he remained there.

At the close of the case, defendant asked the trial court to require the state to elect the theory on which it wanted to proceed—whether he had entered the victim's home unlawfully or whether he had remained there unlawfully. Alternatively, defendant asked the court to instruct the jury that at least 10 of its members had to agree on one (or both) of those theories. The trial court denied both motions. It ruled:

"All right. With regard to the phrase 'enter or remain unlawfully,' I'm going to deny the motion to require an election by the state. I'm also going to deny the request for a *Boots* instruction with regard to that. I note that

the statute, ORS 164.205(3), defines the phrase 'enter or remain unlawfully' as a single phrase that has its own definition. So it makes no distinction. It is actually one thing. So I don't think there's an election to be made under the law there."

Consistently with that ruling, the trial court did not give defendant's requested instruction. Rather, it instructed the jury that, to establish that defendant had committed the crime of first-degree burglary, the state had to prove that defendant "entered or remained unlawfully in the premises described in the charge." The jury found defendant guilty of first-degree burglary, and the trial court entered judgment accordingly.

On appeal, the Court of Appeals affirmed the trial court's judgment. It reasoned that, as a matter of legislative intent, entering and remaining unlawfully are two ways of proving a single element of first-degree burglary—unlawful presence in a dwelling—and that Article I, section 11, does not require jury concurrence on alternative means of proving a single element. *Pipkin*, 245 Or App at 79-80. We allowed defendant's petition for review to consider the level of factual specificity on which either state statutes or the state constitution requires jury agreement.[1] We have addressed that issue in *Boots* and three other cases: *State v. King*, 316 Or 437, 852 P2d 190 (1993); *State v. Lotches*, 331 Or 455, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001); and *State v. Hale*, 335 Or 612, 75 P3d 448 (2003), *cert den*, 541 US 942 (2004).[2] Those four cases address two conceptually distinct situations, and it is helpful to distinguish them.

One situation occurs when a statute defines one crime but specifies alternative ways in which that crime can be committed. *Boots* and *King* addressed that situation. In *King*, for example, a statute made it a crime to drive either under the influence of intoxicants or while having a blood

---

[1] In his petition for review, defendant mentions briefly that the trial court should have required the state to elect. His brief on the merits focuses on the jury concurrence issue, and we limit our decision to that issue.

[2] In *State v. Sparks*, 336 Or 298, 316-17, 83 P3d 304 (2004), the court declined to reach as plain error the defendant's unpreserved claim that the jury had to agree unanimously on whether certain predicate crimes occurred in the defendant's bedroom, on a railroad embankment, or at both locations.

alcohol content of .08 or higher, and the question was whether 10 members of the jury had to agree on one of those alternative ways of committing that crime.[3] As this court explained in *King*, the answer to that question turns initially on what the legislature intended. 316 Or at 441-42. If the legislature intended that each of those alternatives is a separate statutory element, then jury concurrence is required on each element. *Id.* at 446. If, however, the legislature intended that the alternative ways of committing the crime are different factual ways of proving the same element, the remaining question is whether the constitution prohibits that legislative choice. *See id.* at 447.

The other situation arises when the indictment charges a single violation of a crime but the evidence permits the jury to find multiple, separate occurrences of that crime. An indictment, for example, might charge one act of statutory rape, but the evidence may disclose multiple, separate occurrences of statutory rape. *See State v. Reyes*, 209 Or 595, 622, 303 P2d 519, 304 P2d 446, 308 P2d 182 (1957) (describing that situation). *Hale* and *Lotches* arose in that context.[4] Ordinarily, a defendant faced with that problem can ask the state to elect the occurrence on which it wishes to proceed and, in that way, limit the jury's consideration to a single occurrence. *See, e.g., State v. Lee*, 202 Or 592, 276 P2d 946 (1954); *State v. Ewing*, 174 Or 487, 496, 149 P2d 765 (1944). Alternatively, *Hale* and *Lotches* hold that a defendant can ask for an instruction requiring jury concurrence on one of the several occurrences that the record discloses.

---

[3] In criminal cases, at least 10 jurors must agree on the verdict, except for charges of murder, which require unanimous jury agreement. *See* ORS 136.450 (requiring jury agreement in "a jury trial in a criminal action"); Or Const, Art I, § 11 (requiring jury agreement in criminal actions "in circuit court").

[4] In *Lotches*, the indictment charged the defendant with three counts of aggravated murder, each of which allegedly had been committed in the course of and in furtherance of three separate predicate crimes. 331 Or at 462-63. The *Boots* issue arose because, for each count, the evidence permitted the jury to find multiple occurrences of each predicate crime. *Id.* at 465-69. Similarly, in *Hale*, the indictment charged the defendant with five counts of aggravated murder based on the claims that the defendant had committed the murder to conceal the crime of third-degree sexual abuse and to conceal the perpetrator of that crime. 335 Or at 624-25. The *Boots* issue arose in *Hale* because, for each count, the evidence permitted the jury to find multiple, separate occurrences of the predicate crime of third-degree sexual abuse. *Id.* at 629.

This case presents the first situation. ORS 164.225 specifies that a defendant can commit the crime of first-degree burglary by entering or remaining in a dwelling unlawfully with the intent to commit a crime therein.[5] In determining whether 10 jurors must agree on one of those statutory alternatives, we look initially to *Boots* and *King*, the two decisions from this court that addressed a similar issue. Because the parties read *Boots* and *King* differently, we begin by discussing what those cases held. We then apply their holdings to the issue that defendant raises on review.

*Boots* was the first decision from this court to consider jury concurrence. *See* 308 Or at 376 (so stating). To convict the defendant in *Boots* of aggravated murder, the jury had to find that he had committed murder accompanied by at least one of 17 aggravating circumstances. The indictment in *Boots* alleged two aggravating circumstances—that the defendant had committed murder (1) personally and intentionally in the course of and in furtherance of a robbery and (2) to conceal the identities of the perpetrators of a robbery. *Id.* at 374. Proof of either aggravating circumstance was sufficient to elevate the crime of murder to aggravated murder. The trial court instructed the jury in *Boots* that all the jurors need not agree on the same aggravating circumstance. It was sufficient, the instruction provided, if the jurors found that one or the other aggravating circumstance was present.

This court reversed. It began from the proposition that, in an aggravated murder case, all the jurors have to agree, at a minimum, on each legislatively defined element of the crime. *Id.* at 377.[6] That proposition accordingly led to

---

[5] In this case, defendant did not enter or remain unlawfully in the victim's home on multiple, separate occasions. If he had, this case would also present the situation discussed in *Hale* and *Lotches*.

[6] The court did not identify the basis for that proposition but instead appeared to view it as self-evident. *See* 308 Or at 377. As explained below, we think the proposition finds its basis in Article I, section 11. We also note that a majority of the Court in *Schad v. Arizona*, 501 US 624, 111 S Ct 2491, 115 L Ed 2d 555 (1991), viewed it as axiomatic that jurors have to agree on each legislatively defined element of a crime. *See* 501 US at 636 (plurality); *id.* at 654 (White, J., dissenting). The plurality and the dissent in *Schad* disagreed whether the alternative ways of committing the crime in that case were independent elements. *See id.* at 636 (plurality) (state law identified two alternative means of proving a single element); *id.* at 655 (White, J., dissenting) (each alternative means was a separate element).

the question whether the legislature intended that each of the 17 aggravating factors is a separate element of the crime of aggravated murder, on which all the jurors must agree, or whether the legislature intended to require proof of a single element—a generic "aggravating circumstance"—that could be proved in 17 ways. The state took the latter position in *Boots* and, relying on cases from other states, argued that there was no constitutional infirmity in the legislature's specifying different factual ways of proving a single statutory element.

As we read *Boots*, the court concluded that, as a matter of legislative intent, each of the 17 aggravating circumstances was a separate element. Specifically, the court focused on the disparate and unrelated nature of those aggravating circumstances. 308 Or at 373. It then reasoned that the cases on which the state relied were distinguishable either because "the [underlying] statutes [in those cases] differ[ed]" or because those cases "involve[d] issues different from the present case and are not in point." *Id.* at 377-79 and nn 5, 6.[7] Finally, the court quoted a passage from *United States v. Gipson*, 553 F2d 453 (5th Cir 1977), in which the Fifth Circuit had held that alternative statutory means of committing a particular federal crime were too disparate to satisfy the Sixth Amendment jury unanimity requirement. *Id.* at 380-81. This court explained that "[t]he *Gipson* opinion comes closer to the present case than do cases like [a Michigan case on which the state relied that considered] statutes defining who besides the primary actor is a principal." *Id.* at 381.

Having reviewed those considerations, this court held, "Nothing in ORS 163.095 [defining the crime of aggravated murder] or in ORS 136.450 [requiring jury unanimity in murder cases] requires or supports an instruction [permitting jurors to rely on a mix of aggravating circumstances] that, as *Gipson* notes, creates serious constitutional doubts." *Id.* As we interpret that holding, *Boots* reasoned that, as a

---

[7] Some of the cases on which the state relied involved alternatives that were not as disparate as the 17 aggravating circumstances in ORS 163.095. *See Boots*, 308 Or at 377 n 6. Others involved situations in which one alternative necessarily included the other. *Id.* at 378-79 and n 6.

matter of legislative intent, each aggravating circumstance is a separate element and, as such, requires jury unanimity. The constitution explicitly factored into the court's holding only to the extent that the court interpreted the aggravated murder statute to avoid "constitutional doubts." And, because *Gipson* was applying the Sixth Amendment to the United States Constitution, the reference to "constitutional doubts" in *Boots* appears to refer to federal constitutional doubts, not state constitutional ones. The difference matters because a majority of the United States Supreme Court later disagreed with the rationale in *Gipson*. *See Schad v. Arizona*, 501 US 624, 634-37, 111 S Ct 2491 115 L Ed 2d 555 (1991) (plurality) ("We are not persuaded that the *Gipson* approach really answers the question[.]"); *id.* at 650-51 (Scalia, J., concurring in part and concurring in the judgment) (looking solely to history to determine what due process requires).

Four years later in *King*, this court interpreted *Boots* in the same way that we do today. The court explained in *King* that the "basic rationale of [*Boots*] is that each of the 17 special circumstances or 'aggravating factors' listed in ORS 163.095 is an element of a separate and distinct crime." 316 Or at 441. *King* also recognized, as *Boots* had, that "[e]ach element of each crime must be proven to each juror beyond a reasonable doubt." *Id.* It followed from those two propositions that *Boots* turned on the conclusion that, in specifying alternative means of committing aggravated murder, the legislature had intended to identify separate elements, each of which required jury unanimity.

Having interpreted *Boots* that way, the court began its own analysis in *King* by determining the legislature's intent in enacting ORS 813.010, which prohibits driving under the influence of intoxicants (DUII). A person violates that statute if the person drives a vehicle while the person (1) has a blood alcohol content of .08 or higher or (2) "'[i]s under the influence of intoxicating liquor * * *.'" *See King*, 316 Or at 439 n 1 (quoting the DUII statute). As in *Boots*, the question in *King* was whether 10 members of the jury had to agree on one of those alternatives to find the defendant guilty of DUII or whether the jurors could rely on a combination of those alternatives to find a defendant guilty.

After analyzing the text, context, and legislative history of the DUII statute, the court concluded in *King* that the legislature had intended to provide two means of proving the same element—that the person drove while "under the influence of intoxicants." *Id.* at 445-46. One means of proof turned on whether the person was perceptibly impaired; the other turned on the person's blood alcohol content. *Id.* Neither was a separate element.

Having concluded that the legislature had intended to specify alternative means of proving a single element of the crime of DUII, the court in *King* turned to whether the DUII statute, so construed, violated the Due Process Clause. *See id.* at 446-47.[8] In resolving that federal issue, the court found the following passage from the plurality opinion in *Schad* persuasive:

> "'We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.'"

*Id.* at 447 (quoting *Schad*, 501 US at 631-32) (internal quotation marks omitted).

As we read *Boots* and *King*, they reaffirm a principle that this court has long recognized. When faced with a claim that the state or federal constitution requires that jurors agree on one of several ways of committing a crime, a court initially should determine the legislature's intent in enacting the underlying criminal statute. If, as in *Boots*, the legislature intended that each alternative means of committing the crime is a separate element, then *Boots* teaches

---

[8] The defendant in *King* had argued that permitting the jury to rely on some combination of the two ways of proving impairment violated Article I, section 11. This court did not discuss that state constitutional argument. Rather, after concluding that the legislature had intended to provide two alternative means of proving a single element, the court turned to the defendant's federal constitutional argument and discussed only that constitutional claim. *See* 316 Or at 446-47.

that jury concurrence follows as a result of that legislative determination. Alternatively, if, as in *King*, the legislature intended to provide two ways of proving a single element, then the underlying statute does not require jury concurrence, and the question that remains is whether the legislature's choice violates either the state or federal constitution.

Following *Boots* and *King*, we begin by examining the legislature's intent in providing that a person commits first-degree burglary if "the person enters or remains unlawfully" in a dwelling with the intent to commit a crime therein. *See* ORS 164.225; ORS 164.215.[9] ORS 164.205(3) defines the phrase "enter or remain unlawfully" for the purposes of the burglary statutes. That definitional statute provides, in part:

"(3)  'Enter or remain unlawfully' means:

"(a)  To enter or remain in or upon premises when the premises, at the time of such entry or remaining, are not open to the public or when the entrant is not otherwise licensed or privileged to do so[.]"

ORS 164.205(3)(a).[10]

The text of ORS 164.205(3) makes clear that a person can enter private property lawfully but remain there unlawfully if, "at the time of such * * * remaining," the person no longer has a "licens[e] or privileg[e]" to be there. Put differently, a person who remains unlawfully need not have entered unlawfully. Conversely, a person can enter private property unlawfully. Almost every person who enters private property unlawfully will also remain there unlawfully. To be sure, there may be the odd case in which a person enters private property unlawfully but then receives a license or privilege to remain there. But that would appear to be the exception rather than the rule.

---

[9]  ORS 164.215 provides that a person commits the crime of second-degree burglary "if the person enters or remains unlawfully in a building with intent to commit a crime therein." ORS 164.225 provides that a person commits the crime of first-degree burglary if, among other things, the person violates ORS 164.215 and the building is a dwelling.

[10]  ORS 164.205(3) defines "enter or remain unlawfully" as it applies to different types of property. Because this case concerns a home, we quote only the part of that definition that applies to private premises.

In arguing that the legislature intended that entering and remaining unlawfully are separate elements, defendant contends that the legislature used "or" to designate two exclusive alternatives. As we recently explained, however, the legislature may use "or" in either an exclusive or an inclusive sense. *See Burke v. DLCD*, 352 Or 428, 435-36, 290 P3d 790 (2012) (describing the exclusive and inclusive uses of "or"). Used in an inclusive sense, the word "or" "mean[s] one or the other, *or both*." *Id.* (emphasis in original).[11] We infer from the context in which the legislature used "or" in ORS 164.205(3) that it used that word in its inclusive sense; that is, because unlawfully entering on private premises will almost always entail unlawfully remaining there as well, a person can commit burglary by entering unlawfully or by remaining unlawfully or by entering and remaining unlawfully. Put differently, the text of ORS 164.205(3) implies that entering and remaining unlawfully are two alternative and sometimes complementary ways of proving a defendant's unlawful presence in a dwelling that, when accompanied by an intent to commit a crime therein, will constitute first-degree burglary.

That is how this court has interpreted the legislative history underlying the definition of "enter or remain unlawfully." *See State v. White*, 341 Or 624, 639-40, 147 P3d 313 (2006) (interpreting the legislative history). This court explained in *White* that the legislature expanded the crime of burglary to include not only persons who enter property unlawfully with an intent to commit a crime therein but also persons who enter property lawfully but who remain there unlawfully, if they have the requisite criminal intent. *Id.* at 639 (quoting Commentary to the Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 135 (July 1970)). The court inferred from the legislative history that the legislature did not intend that "a defendant who commits burglary by entering a [dwelling] unlawfully commits an additional, separate violation of the burglary statute by remaining in the dwelling thereafter." *Id.* Rather, the act of remaining unlawfully in a dwelling

---

[11] As *Burke* observed, asking someone whether she wants "cream or sugar" with her coffee does not exclude the possibility of having both. 352 Or at 436.

after unlawfully entering is simply a continuation of the act that gave rise to the crime of first-degree burglary in the first place.[12]

Given the text and legislative history of the burglary statute, we agree with the Court of Appeals that the legislature did not intend that entering and remaining unlawfully are separate elements, each of which requires the agreement of 10 jurors in order to find a defendant guilty of first-degree burglary. Rather, entering and remaining unlawfully are interchangeable and often overlapping findings from which the jury can conclude that the defendant's presence in a dwelling was unlawful. As a matter of legislative intent, the trial court correctly declined to instruct the jurors that they had to agree whether defendant unlawfully entered or instead unlawfully remained.

The question that remains is whether ORS 164.225, as we have interpreted it, runs afoul of Article I, section 11, of the Oregon Constitution.[13] On that issue, defendant argues:

> "[E]ven if this court decides that 'enters or remains unlawfully' constitutes the single element of unlawful presence, a jury concurrence instruction is still required. Under *Boots*, *Lotches*, and *Hale*, the jury must agree on the facts essential to prove that element."

(Emphasis omitted.) Defendant's argument is problematic for two reasons.

First, the cases on which defendant relies do not address the issue he raises. Defendant reads *Boots* as resting on Article I, section 11. We read *Boots* as resting primarily on its interpretation of ORS 163.095. *Boots* referred to Article I, section 11, only once. At the beginning of the opinion, the court noted that, because aggravated murder is a capital offense, "[w]e must therefore decide this case in light of the command not only of ORS 136.450 but also of

---

[12] The question in *White* was whether the defendant had committed two crimes by entering and remaining unlawfully in a dwelling. Although this case presents a related but separate question, the court's interpretation of the legislative history in *White* bears on our resolution of the issue presented here.

[13] Defendant has not raised a federal constitutional claim in this court.

Article I, section 11, of the Oregon Constitution that capital ('first degree') murder requires a unanimous verdict." *Boots*, 308 Or at 374.[14] Having said that, the court never returned to Article I, section 11. It never quoted, discussed, or analyzed that provision (or ORS 136.450 for that matter) in the remainder of its decision. Rather, it based its decision primarily on its interpretation of the aggravated murder statute.

To be sure, *Boots* hinted at constitutional doubts that could arise if it interpreted the aggravated murder statute differently. But the constitutional doubts to which *Boots* referred came from *Gipson*, a 1977 Fifth Circuit decision interpreting the Sixth Amendment that the United States Supreme Court later disavowed. In our view, *Gipson* provides a poor basis from which to derive an independent analysis of the Oregon Constitution. Similarly, *Hale* and *Lotches* do little to advance defendant's state constitutional claim. Not only do those cases address a different issue (whether jury concurrence is required when the record discloses multiple separate occurrences of the charged crime), but both *Hale* and *Lotches* simply cited *Boots* without engaging in any further analysis of Article I, section 11. In our view, none of the cases on which defendant bases his Article I, section 11, argument provides support for it.[15]

Second, in the absence of controlling case law, an analysis of what Article I, section 11, requires in this context must begin with an examination of that provision's text, context, and legislative history. *See State v. Reinke*, 354 Or 98, 106, 309 P3d 1059 (2013), *adh'd to as modified on recons*, 354 Or 570, 316 P3d 286 (2013). On that point, we observe that,

---

[14] Article I, section 11, provides, in part: "[I]n the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict."

When the court wrote *Boots*, ORS 136.450 provided:

"Except as otherwise provided, the verdict of a trial jury in a criminal action shall be by concurrence of at least 10 of 12 jurors except in a verdict for murder which shall be unanimous."

ORS 136.450 (1987). That statute has been amended since then but not in ways that bear on its meaning in this context.

[15] Defendant does not base his Article I, section 11, argument on *King*. As noted, that decision does not address Article I, section 11.

as initially adopted, Article I, section 11, did not expressly require that juries be unanimous. Rather, it provided only that, "[i]n all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *." Or Const, Art I, § 11 (1857). To be sure, this court assumed early on that jurors in criminal cases had to be unanimous. *See State v. Ivanhoe*, 35 Or 150, 151-53, 57 P 317 (1899) (making that assumption in the course of discussing a jury instruction). However, the court did not identify whether its assumption rested solely on the common law or the proposition that the right to a jury recognized in Article I, section 11, incorporated the common law. *See id.*; cf. *Apodaca v. Oregon*, 406 US 404, 408 n 3, 92 S Ct 1628, 32 L Ed 2d 184 (1972) (plurality) (discussing common law and state constitutional sources for jury unanimity).

In 1934, the people approved a legislatively referred amendment to Article I, section 11, that for the first time expressly addressed jury concurrence and jury unanimity. That amendment added the following provision to Article I, section 11: "[I]n the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict." *See* Or Laws 1935, p 5. We consider the same sources in interpreting the 1934 amendment that we consider in interpreting a statute. *See Reinke*, 354 Or at 106; *State v. Harrell / Wilson*, 353 Or 247, 254-55, 297 P3d 461 (2013). We look to its text, context, and legislative history, "should [the legislative history] appear useful to our analysis." *See State v. Algeo*, 354 Or 236, 246, 311 P3d 865 (2013) (explaining the methodology for interpreting a referred constitutional amendment).

The text of the 1934 amendment requires that at least 10 members of the jury concur in "a verdict of guilty or not guilty." At first blush, that text might suggest that the only thing on which jurors must agree is a defendant's guilt or innocence. However, we do not interpret text in isolation; we also consider the historical context against which that text was enacted. *See Reinke*, 354 Or at 107 (explaining that context includes "the preexisting common law and the statutory framework within which the law was enacted"). In this case, that context provides guidance in two respects. First, a

jury's verdict does not simply reflect the jury's impressionistic sense of guilt or innocence. Rather, a verdict is the product of the jurors' application of the court's instructions to the evidence presented at trial. In a criminal case, the court's instructions tell the jury each element that the state must prove in order for the jury to return a verdict of guilty. It follows from that context that the requirement in Article I, section 11, that at least 10 jurors must concur in "a verdict of guilty or not guilty" does not mean that those jurors have to agree only on an outcome. Rather, it reflects the proposition that this court posited in *Boots* and reiterated in *King*—to return a verdict of guilty, the jurors have to agree that the state has proved each legislatively defined element of a crime. *See King*, 316 Or at 441 (interpreting *Boots* as holding that "[e]ach element of each crime must be proven to each juror beyond a reasonable doubt"); *Boots*, 308 Or at 377 (stating that proposition).

The context bears on the text's meaning in another way. Defendant contends that Article I, section 11, requires that 10 jurors must agree not only on each legislatively defined element of a crime but also on the underlying "facts essential to prove that element." However, the cases that preceded the 1934 amendment to Article I, section 11, cut against that position. As the plurality explained in *Schad*, criminal cases from 1899 to 1932 "reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed." 501 US at 631. Additionally, those cases "never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone." *Id.* It followed from those cases, the plurality concluded in *Schad*, that due process does not necessarily require jury unanimity when the legislature has identified alternative means of proving a single element.[16] *Id.*

---

[16] The opinion concurring in the judgment did not disagree with either the plurality's description of history or the conclusion it drew from it. *See Schad*, 501 US at 649-50 (Scalia, J., concurring in part and concurring in the judgment). However, the concurring opinion would have relied solely on history to resolve the defendant's due process claim. *Id.*

Oregon cases before 1934 point in the same direction. *See State v. Laundy*, 103 Or 443, 466, 204 P 958, 206 P 290 (1922) (explaining that, "where a single offense may be committed by several means[,] it may be charged in a single count to have been so committed, if the ways or means are not repugnant"). This court explained as early as 1876 that, "[w]hen [a] statute makes it a crime to do this or that, mentioning several things disjunctively, the indictment may, as a general rule, embrace the whole in a single count * * *." *State v. Carr*, 6 Or 133, 134-35 (1876). In Oregon, as in the rest of the country, the jury could return a general verdict on a single count even when the indictment specified alternative means of committing the crime charged in that count. Oregon Code, title XII, ch IX, § 941 (1930); *see* Joel Prentiss Bishop, 1 *New Criminal Procedure* § 436 (1895) ("[T]he indictment on [statutes that provide for multiple ways of committing a single crime] may allege, in a single count, that the defendant did as many of the forbidden things as the pleader chooses, * * * and it will be established at the trial by proof of any of them.").

In *Carr*, for example, the indictment alleged that the defendant had violated a criminal statute that prohibited "deal[ing]," "play[ing]," or "carry[ing] on" a game of faro. 6 Or at 134; *see* General Laws of Oregon, Crim Code, ch IX, title II, § 708, p 443 (Deady & Lane 1843-1872) (prohibiting that conduct). The defendant argued that the indictment impermissibly charged more than one offense because dealing and playing were distinct acts. 6 Or at 134. The court disagreed, reasoning:

> "True, the offense is committed by dealing or playing, but we apprehend that dealing and playing and carrying on a 'game of faro' all at the same time and at one sitting, and between the same parties, would constitute but one offense; and such an indictment may be supported by showing that the defendant has done one of these things."

*Id.* at 134-35. As we understand the decision in *Carr*, the question whether the defendant had dealt or played a game of faro was immaterial to the question whether he participated in the game, at least when both acts occurred "at one sitting." The jurors could return a general verdict without

regard to whether the jury based its verdict on one act or the other or some combination of both.

We finally consider the legislative history of the 1934 amendment to Article I, section 11. In our view, the legislative history is generally neutral on the issue this case presents. The argument in the Voters' Pamphlet in support of the 1934 amendment told the voters that "[t]he proposed constitutional amendment is to prevent one or two jurors from controlling the verdict or causing a disagreement." Official Voters' Pamphlet, Special Election, May 18, 1934, 7. The people who argued in favor of the amendment did so primarily as a matter of economy. They reasoned that requiring jury unanimity in criminal cases had led to unnecessary economic and social costs in the form of retrials, congested trial dockets, and compromise verdicts reached to avoid the necessity of a retrial. *Id.* For that reason, the 1934 amendment provided that only 10 members of the jury had to concur in the verdict in most criminal cases.

That history does not shed any light on the issue that this case presents. The proponents of the 1934 amendment did not seek to limit or expand the issues on which jurors must be unanimous; rather, they sought to avoid the unnecessary economic and social costs that juror unanimity can entail by reducing the number of jurors who must concur. To the extent that the legislative history has any bearing on the issue this case presents, it counsels against requiring jury concurrence on too fine a point.

Considering the text, context, and history of the 1934 amendment, we conclude that they cut against extending the requirements of jury concurrence and unanimity beyond the legislatively defined elements of a crime. That is not to say that Article I, section 11, imposes no limit on the legislature's ability to identify alternative means of proving the same element. *Cf. Laundy*, 103 Or 466-75 (noting limits on including multiple means of committing an act in a single count). We need not, however, define those limits to decide this case. As explained above, even though entering and remaining unlawfully can be separate, discrete acts, they often complement each other so that entering unlawfully can shade imperceptibly into remaining unlawfully. These

alternative ways of proving unlawful presence in a dwelling are not so repugnant that they could not have been joined in a single count. *See id.* at 466; *Carr*, 6 Or at 134-35. Nor are they the sort of disparate, unrelated acts that raised serious constitutional doubts in *Boots*. Whatever the outer limits of the legislature's authority to specify alternative means of proving the same element may be, the burglary statute falls well within that authority.

The decision of Court of Appeals and the judgment of the circuit court are affirmed.