Argued and submitted November 18, 2014, reversed and remanded with
instructions for the post-conviction court to grant petitioner relief on Counts 7
and 8, otherwise affirmed July 7, 2016

MICHAEL ALEXANDER MELLERIO,
*Petitioner-Appellant,*

*v.*

Mark NOOTH,
Superintendent,
Snake River Correctional Institution,
*Defendant-Respondent.*

Malheur County Circuit Court
12029285P; A153539

379 P3d 560

Jason E. Thompson argued the cause for appellant. With
him on the brief was Ferder, Casebeer, French & Thompson,
LLP.

David B. Thompson, Assistant Attorney General, argued
the cause for respondent. With him on the brief were Ellen F.
Rosenblum, Attorney General, and Anna M. Joyce, Solicitor
General.

Before Sercombe, Presiding Judge, and Tookey, Judge, and Haselton, Senior Judge.*

---

* Haselton, S. J., *vice* Hadlock, C. J.

## HASELTON, S. J.

Petitioner appeals a judgment denying post-conviction relief. ORS 138.650. He contends, *inter alia*, that the post-conviction court erred in rejecting his claim of constitutionally inadequate representation based on criminal trial counsel's failure to request a *"Boots"* jury concurrence instruction[1] relating to four counts of coercion, ORS 163.275, on which he was convicted. For the reasons that follow, we conclude that: (1) with respect to two of the coercion counts (Counts 5 and 6), a jury concurrence instruction would have been inapposite, rendering counsel's performance unexceptionable; but (2) with respect to the two other counts (Counts 7 and 8), counsel's failure to request such an instruction breached the standard of constitutionally competent representation and that petitioner was actionably prejudiced by that failure. That disposition, in turn, obviates consideration of petitioner's contention that counsel was inadequate for failing to request merger, upon the jury's verdict, of Counts 5 and 7, and of Counts 6 and 8. Finally, we reject, without published discussion, petitioner's other contentions pertaining to the purported inadequacy of trial counsel with respect to his other convictions. Accordingly, we conclude that petitioner is entitled to post-conviction relief as to Counts 7 and 8, but otherwise affirm.

The material historical facts and procedural circumstances are, for purposes of our review, undisputed. On June 30, 2010, petitioner was charged by indictment with 12 crimes, involving two victims, Rife and Gabaldon, arising out of events occurring in Yamhill County on May 27, 2010. Specifically, petitioner was charged with two counts of first-degree kidnapping, ORS 163.235, with one count pertaining to Rife and the other to Gabaldon (Counts 1 and 2); two counts of second-degree robbery, ORS 164.405, again, one each pertaining to Rife and Gabaldon (Counts 3 and 4); four counts of coercion, ORS 163.275, with two counts (Counts 5 and 7) pertaining to Rife, and two counts (Counts 6 and 8) pertaining to Gabaldon; two counts of menacing, ORS 163.190, with one count again relating to Rife and the

---

[1] *See State v. Boots*, 308 Or 371, 780 P2d 725 (1989), *cert den*, 510 US 1013 (1993), described below. 279 Or App at 429-30.

other to Gabaldon (Counts 9 and 10); one count of fourth-degree assault, ORS 163.160, pertaining to Rife only (Count 11); and one count of second-degree theft, ORS 164.045, also pertaining only to Rife (Count 12).

The coercion counts alleged:

"COUNT 5—The defendant, on or about May 27, 2010, in Yamhill County, Oregon, did unlawfully and knowingly compel or induce H. Rife *to engage in conduct in which she had a legal right to abstain from engaging*, by means of instilling in her a fear that if she refrained from the conduct contrary to the compulsion or inducement, the said defendant would physically injure or kill H. Rife and/or her family; contrary to statute and against the peace and dignity of the State of Oregon.

"COUNT 6—The defendant, on or about May 27, 2010, in Yamhill County, Oregon, did unlawfully and knowingly compel or induce M. Gabaldon *to engage in conduct in which she had a legal right to abstain from engaging*, by means of instilling in her a fear that if she refrained from the conduct contrary to the compulsion or inducement, the said defendant would physically injure or kill M. Gabaldon and/or her family; contrary to statute and against the peace and dignity of the State of Oregon.

"COUNT 7—The defendant, on or about May 27, 2010, in Yamhill County, Oregon, did unlawfully and knowingly compel or induce H. Rife *to abstain from engaging in conduct in which she had a legal right to engage*, by means of instilling in her a fear that if she engaged in the conduct contrary to the compulsion or inducement, the said defendant would physically injure or kill her, her family, *E. Coleman and/or K. Coleman*; contrary to statute and against the peace and dignity of the State of Oregon.[2]

"COUNT 8—The defendant, on or about May 27, 2010, in Yamhill County, Oregon, did unlawfully and knowingly compel or induce M. Gabaldon *to abstain from engaging in conduct in which she had a legal right to engage*, by means of instilling in her a fear that if she engaged in the conduct contrary to the compulsion or inducement, the said defendant would physically injure or kill her, her family,

---

[2] As described below, 279 Or App at 424, the Colemans were a couple whom petitioner, Rife, and Gabaldon encountered during the events of May 27, 2010.

*E. Coleman and/or K. Coleman*; contrary to statute and against the peace and dignity of the State of Oregon."

(Emphases added.)

Thus, the first of the two "paired" coercion counts, Counts 5 and 6, alleged that Rife or Gabaldon had been unlawfully induced or compelled to "engage in conduct in which she had a legal right to abstain from engaging," ORS 163.275(1), while the latter two "paired" counts, Counts 7 and 8, alleged the obverse species of coercion, that is, that Rife or Gabaldon had been induced or compelled to "abstain from conduct in which she had a legal right to engage." *Id.*[3] Further, and significantly to our consideration, the latter two counts, while not identifying the putative conduct from which either woman was allegedly compelled to abstain, did specify that the referent concomitant threat was that petitioner would injure or kill "her, her family, E. Coleman and/or K. Coleman." That language was ambiguous in that it could encompass either (or both): (1) a single act of coercion predicated on a threat to injure or kill one or more of the specified individuals (*i.e.*, "If you don't do 'x,' I will injure or kill A, B, C, and/or D"); or (2) multiple, separate acts of coercion predicated on threats to injure or kill different of the specified individuals (*e.g.*, "If you don't do 'x,' I will kill or injure A"; "If you don't do 'y,' I will kill or injure B"; etc.). It is that ambiguity, coupled with the evidence presented at petitioner's criminal trial, that is the striking point of petitioner's contention that counsel was inadequate for failing to seek a jury concurrence instruction with respect to Counts 7 and 8.

Following a jury trial in January 2011, petitioner was convicted of all charges. At trial, Gabaldon testified as a witness for the state. Rife did not testify.

---

[3] ORS 163.275 provides, in part:

"(1) A person commits the crime of coercion when the person compels or induces another person to engage in conduct from which the other person has a legal right to abstain, or to abstain from engaging in conduct in which the other person has a legal right to engage, by means of instilling in the other person a fear that, if the other person refrains from the conduct compelled or induced or engages in conduct contrary to the compulsion or inducement, the actor or another will:

"(a) Unlawfully cause physical injury to some person[.]"

Gabaldon recounted that she, petitioner, and Rife were all acquaintances and that, on May 27, 2010, petitioner had asked her to drive him to a friend's house in McMinnville (petitioner did not know how to drive), and Rife came with them. During the drive, petitioner accused Rife of stealing from one of his friends and began to make threatening comments, referring to his gang membership, to both Rife and Gabaldon. At some point after making his initial threats and while displaying a knife, petitioner told Gabaldon to change course and, instead of proceeding to the friend's house, to drive to another, isolated rural location. Gabaldon acquiesced because of petitioner's threats. En route, petitioner punched Rife in the face, brandished a large knife, and threatened to sexually assault Rife with a road flare. Once they arrived at the remote location, petitioner, still brandishing the knife, ordered Rife to partially disrobe, which she did.

Gabaldon further testified that she was afraid that petitioner would kill Rife and, before matters could deteriorate further, in an effort to distract him and obtain help, she convinced petitioner that her car was malfunctioning and would not start. Gabaldon persuaded petitioner that the three of them should hike to a house that they had passed as they drove to the remote site and obtain help in jump-starting her car. As they approached the house—which was the Colemans' home—petitioner, who was still carrying the large knife, told Rife and Gabaldon to "act like nothing had happened" or he would kill the house's occupants. Neither Rife nor Gabaldon told the Colemans about petitioner's conduct.

Ultimately, petitioner, Rife, and Gabaldon returned, along with Mr. Coleman, to Gabaldon's abandoned car. After the car "restarted" and they had left Mr. Coleman, they drove back to McMinnville. Gabaldon testified that, as they drove, petitioner told Rife and Gabaldon that, if they spoke to the police about what had occurred, he would injure or kill them or members of their families. For example, petitioner told Gabaldon that he "knew where my husband had worked * * * and he knew where my son slept," and that "you know what I'm capable of," so "don't try anything funny." In addition, according to Gabaldon, on at least one occasion

after May 27, 2010, petitioner reiterated his threats to harm her family if she spoke with the police. Gabaldon testified that, because of petitioner's threats, she did not contact the police; however, when the police contacted her, she did cooperate in their investigation.[4] Thus, Gabaldon's testimony at trial substantiated one instance in which petitioner unlawfully compelled Gabaldon to engage in conduct from which she had a right to abstain (*viz.*, driving to the secluded area instead of to the friend's home) and one instance in which petitioner had unlawfully compelled Rife to engage in conduct from which she had a right to abstain (*viz.*, partially disrobing). That testimony also substantiated *two* (and possibly, three)[5] instances in which petitioner had compelled Gabaldon to abstain from conduct in which she had a legal right to engage (*viz.*, informing the Colemans of petitioner's conduct, and informing the police of petitioner's conduct) and *two* instances in which petitioner had compelled Rife to abstain from conduct in which she had a legal right to engage (again, informing the Colemans of petitioner's conduct, and informing the police of petitioner's conduct). Those "abstain from" instances were temporally and spatially distinct, with the interaction with the Colemans having ended before petitioner made the threats about not informing the police, as he and the two women drove back to McMinnville, and they were predicated on different threats—the former, on the threat to kill the Colemans, and the latter, on the threats against the victims and their families.

In closing argument, the prosecutor spoke at some length about petitioner's threats to harm the Colemans if either of the women sought their help, and also referred, separately, to the subsequent threats to harm the women or their family members if they informed the police. Later, in addressing the coercion counts specifically, the prosecutor identified "forcing [Rife] to take her clothes off" and "forcing

---

[4] The police investigation was triggered by a phone call from Rife's aunt.

[5] Because Gabaldon's testimony about petitioner's reiterated threats after May 27 is indefinite as to the timing, it is uncertain whether that conduct fell within the "on or about May 27, 2010" temporal allegation of Count 8. *See* 279 Or App at 422-23. That testimony was admitted without any objection that it was beyond the scope of the indictment. In all events, as will become apparent, the proper characterization of that testimony is ultimately immaterial to our analysis and disposition.

[Gabaldon] to drive up to" the isolated site as the referents for Counts 5 and 6 respectively, and, in alluding to Counts 7 and 8, stated that "there are specific charges for them not reporting to the Colemans what was going on."

Defense counsel's closing emphasized both Rife's absence and the fact that the Colemans (who testified) had observed no signs that the young women were in any distress—and, indeed, in Ms. Coleman's view, had ample opportunity to seek her assistance without petitioner interfering. Further, and consistent with the overarching defense theory, counsel asserted that Gabaldon's narrative of kidnapping, assault, menacing, and coercion was a self-serving fabrication. Defense counsel did not request an instruction requiring the jury to identify and concur on the referent conduct with respect to each count of coercion, and the court did not give such an instruction.

As noted, the jury found petitioner guilty of all charges, and the court entered corresponding convictions. After the dismissal of his direct appeal, petitioner initiated this action. The operative amended petition for post-conviction relief alleges that trial counsel was constitutionally inadequate in failing to request a *"Boots"* jury concurrence instruction with respect to the coercion counts and that, because of that failure, "the jury was free to pick-and-choose [without requisite consensus] what alleged factual scenarios would constitute the offense." In contesting that allegation, the state[6] submitted, *inter alia*, an affidavit of petitioner's criminal trial counsel in which counsel stated that he had not requested a jury concurrence instruction as to the coercion counts because, in his assessment, "[t]here were not multiple factual scenarios presented for each individual charge." The post-conviction court rejected petitioner's specification relating to the failure to request a jury concurrence instruction, concluding: "No grounds for motion to elect or *Boots* instruction. Specific acts not elements of the crime (counts 6 & 8, 5 & 7)."

On appeal, petitioner renews his *Boots*-related contention, arguing that the record included evidence of multiple

[6] To avoid semantic confusion, we refer to defendant, the superintendent of the correctional facility where petitioner is incarcerated, as "the state."

distinct occurrences that could constitute coercion as charged in Counts 5 to 8 and that, in the absence of a concurrence instruction, different jurors were free to base their verdicts on different occurrences to petitioner's prejudice. Petitioner's position, as amplified during oral argument, appears to embrace two propositions: First, a jury concurrence instruction should be given whenever the evidence as to a single criminal count discloses multiple occurrences that could have been charged separately; and second, defense counsel's failure to request a concurrence instruction in that circumstance both breaches the standard of constitutionally adequate representation and is categorically prejudicial.

The state remonstrates that counsel's failure to request a jury concurrence instruction with respect to Counts 5 and 6 was eminently reasonable, given that the record disclosed only one factual referent for each of those counts (for Count 5, compelling Rife to partially disrobe; for Count 6, compelling Gabaldon to drive to the remote site). With respect to Counts 7 and 8, the state acknowledges that the record discloses at least two different potential factual scenarios for each of those counts (in each, nondisclosure to the Colemans or nondisclosure to the police).[7] In the state's view, however, criminal trial counsel could reasonably have understood that the gravamen of Counts 7 and 8 was that petitioner had unlawfully compelled each victim to abstain from telling *anyone* about his conduct, rendering the "who" (that is the Colemans or the police) a mere collateral "factual detail"—obviating the need for a jury concurrence instruction. Finally, with respect to potential prejudice, the state asserts, as amplified below, 279 Or App at 434-35, that, in all events, given the proof adduced at trial and the theory of defense, petitioner could not have been prejudiced by the lack of a concurrence instruction.

ORS 138.530(1)(a) provides for post-conviction relief when there has been a "substantial denial in the proceedings resulting in petitioner's conviction * * * of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which

---

[7] *See* 279 Or App at 425 & n 5 (noting third potential factual scenario as to Count 8).

denial rendered the conviction void." To establish an entitlement to relief under the Oregon Constitution for inadequate assistance of counsel,[8] a petitioner "must demonstrate two things: that his trial counsel failed to exercise reasonable professional skill and judgment and that he suffered prejudice as a result." *Gable v. State of Oregon,* 353 Or 750, 758, 305 P3d 85 (2013) (citing *Lichau v. Baldwin,* 333 Or 350, 359, 39 P3d 851 (2002)).[9] Under federal law,[10] a petitioner must establish that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 US 668, 687, 104 S Ct 2052, 80 L Ed 2d 674 (1984); *Thompson v. Belleque,* 268 Or App 1, 6, 341 P3d 911 (2014), *rev den,* 357 Or 300 (2015) ("[T]he Oregon Supreme Court has * * * recognized that the [state and federal] standards for determining the adequacy of legal counsel * * * are functionally equivalent[.]" (citing *Montez v. Czerniak,* 355 Or 1, 6-7, 322 P3d 487, *adh'd to as modified on recons,* 355 Or 598, 330 P3d 595 (2014)).

With respect to the requisite showing of prejudice, under Oregon law, a post-conviction petitioner must demonstrate, "based on the facts that the petitioner has established by a preponderance of the evidence," that counsel's deficient performance "had a tendency to affect the result of the trial." *Gable,* 353 Or at 759. In *Green v. Franke,* 357 Or 301, 350 P3d 188 (2015), the court elaborated on the content

---

[8] Article I, section 11, of the Oregon Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel[.]"

[9] In assessing the adequacy of counsel's performance, we are to "make every effort to evaluate a lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight." *Lichau,* 333 Or at 360. Although the Oregon Supreme Court has addressed jury concurrence instructions in opinions issued since petitioner's criminal trial, *e.g., State v. Ashkins,* 357 Or 642, 357 P3d 490 (2015); *State v. Phillips,* 354 Or 598, 317 P3d 236 (2013); *State v. Pipkin,* 354 Or 513, 316 P3d 255 (2013), the state does not contend that those decisions have materially subsequently modified the essential principles governing the applicability of such instructions. Indeed, as we note below, petitioner's counsel's affidavit in this proceeding substantiates his knowledge of those principles. *See* 279 Or App at 431.

[10] The Sixth Amendment to the United States Constitution establishes the federal constitutional right to effective assistance of counsel, providing that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

of the "tendency to affect" standard of prejudice, with specific reference to the conduct of criminal trial counsel:

> "[W]here the effect of inadequate assistance of counsel on the outcome of a jury trial is at issue, it is inappropriate to use a 'probability' standard for assessing prejudice. Instead, because many different factors can affect the outcome of a jury trial, in that setting, the tendency to affect the outcome standard demands more than mere possibility, but less than probability. As the court stated in *Lichau*, the issue is whether trial counsel's acts or omissions 'could have tended to affect' the outcome of the case."

*Id.* at 322-23 (quoting *Lichau*, 333 Or at 365).

Consistent with that construct, our consideration here reduces to (at most) two questions. *First*, did criminal trial counsel fail to exercise reasonable professional skill and judgment in failing to request a jury concurrence instruction as to one or more of the coercion counts? *Second*, if so, is there "more than [a] mere possibility," albeit "less than [a] probability," *Green*, 357 Or at 322, that that failure affected the guilty verdicts as to one or more of the counts for which such an instruction should have been requested?

We begin with some *Boots* basics. Under Article I, section 11, of the Oregon Constitution,[11] to return a verdict of guilty, the requisite number of jurors must "agree that the state has proved each legislatively defined element of a crime." *State v. Pipkin*, 354 Or 513, 527, 316 P3d 255 (2013). That principle, which *may* have been implicit in *State v. Boots*, 308 Or 371, 780 P2d 725 (1989), in which the court held that a trial court had erred in giving an instruction that jurors were *not* required to concur on aggravating circumstances in an aggravated murder prosecution, *id.* at 379,[12] evolved in subsequent cases in which the *"Boots"* rubric became synonymous with the asserted necessity of concurrence instructions in criminal cases. *See, e.g., State v.*

---

[11] Article I, section 11, provides, in part: "[I]n the circuit court ten members of the jury may render a verdict of guilty or not guilty save and except a verdict of first degree murder, which shall be found only by a unanimous verdict."

[12] *See Pipkin*, 354 Or at 518 n 6 (noting that the Supreme Court in *Boots* "did not identify the basis for that proposition but instead appeared to view it as self-evident"); *id.* at 524-25 (noting that the court in *Boots* referred to Article I, section 11, only once and "never quoted, discussed, or analyzed that provision").

*Ashkins*, 357 Or 642, 649-53, 357 P3d 490 (2015) (recounting history); *Pipkin*, 354 Or at 516-21 (same).

As the Supreme Court explained in *Pipkin* (and reiterated in *Ashkins*, 357 Or at 649), those post-*Boots* cases "address[ed] two conceptually distinct situations." *Pipkin*, 354 Or at 516. The first situation "occurs when a statute defines one crime but specifies alternative ways in which the crime can be committed." *Id.* The second situation "arises when the indictment charges a single violation of a crime but the evidence permits the jury to find multiple, separate occurrences of that crime." *Id.* at 517. In the latter circumstance—the circumstance that petitioner asserts existed here with respect to some or all of the coercion counts—"*a defendant can ask for an instruction requiring jury concurrence on one of the several occurrences that the record discloses.*" *Id.* (citing *State v. Hale*, 335 Or 612, 75 P3d 448 (2003), *cert den*, 541 US 942 (2004); and *State v. Lotches*, 331 Or 455, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001)) (emphasis added).

*Ashkins* exemplifies the application of that principle. here, the defendant was charged with one count of first-degree rape, one count of sodomy, and one count of unlawful sexual penetration, all involving the same victim (who was developmentally disabled) and all alleged to have occurred within the same 39-month period. 357 Or at 643-44. At trial, the victim testified about multiple, distinct occurrences of each charged crime, as well as other "nonspecific" and undifferentiated occurrences of those crimes. *Id.* at 644-46. The defendant requested a jury concurrence instruction, but the trial court denied that request.[13] *Id.* at 646-47. The jury found the defendant guilty of each charge. *Id.* at 647.

The Supreme Court concluded that the trial court had erred in refusing to give the requested concurrence instruction. *Id.* at 659. The court acknowledged the special

---

[13] The requested instruction stated:

"In order to reach a lawful verdict as to any count, 10 jurors must agree on what factual occurrence constituted the crime. Thus, in order to reach a guilty verdict on any count, 10 jurors must agree on which factual occurrence constituted the offense."

*Id.* at 647.

challenges presented when a complainant or other witness "may have difficulties in recalling, recounting, or distinguishing among separate occurrences of a particular crime." *Id.* at 658. Nevertheless, the court held that, when the indictment "charged a single occurrence of each offense, but the evidence permitted the jury to find any one or more among multiple, separate occurrences of that offense involving the same victim and the same perpetrator," the defendant "was entitled to a concurrence instruction that correctly stated the law." *Id.* at 659. Accordingly, because the defendant's requested instruction was legally correct, the trial court had erred. *Id.* The court in *Ashkins* then proceeded to consider whether that instructional error was, nevertheless, harmless, *id.* at 660-64—a matter to which we shall return presently.

Although *Ashkins* issued long after petitioner's criminal trial (and, indeed, after the post-conviction court's judgment), the principle it applied, rooted in *Hale* and *Lotches*, was established as of the time of the criminal trial. Indeed, trial counsel's expressed reason for not requesting a concurrence instruction—*viz.*, that there "were not multiple factual scenarios presented for each individual charge," *see* 279 Or App at 426—was phrased in the pertinent terms. Thus, counsel understood the applicable standard.

Counsel's default was not in his knowledge but, instead, in his application of that knowledge—or, more precisely, in one aspect of that application. Although Counts 5 and 6 did not implicate "multiple factual scenarios," Counts 7 and 8 most assuredly did. Accordingly, counsel's failure to request a jury concurrence instruction with respect to the latter two counts constituted a failure to exercise reasonable professional skill and judgment.

As noted, 279 Or App at 422, 424-25, Counts 5 and 6 each alleged that petitioner had compelled the victim (Rife in Count 5, and Gabaldon in Count 6) to "engage in conduct in which she had a legal right to abstain from engaging." The evidence at trial disclosed only one such occurrence as to each victim (compelling Rife to partially disrobe, and compelling Gabaldon to drive to the secluded site). Consequently, the evidence here did not present any

potential for "non-concurring" jurors basing their verdicts on either Count 5 or Count 6 on different occurrences of the charged crime. Counsel's decision not to request a concurrence instruction as to those counts was eminently reasonable.

The same is not true of Counts 7 and 8. As noted, those counts alleged that the petitioner had compelled each of the victims to "abstain from engaging in conduct in which she had a legal right to engage" and referred to threats to physically injure or kill the victim, her family, "and/or" either or both of the Colemans. *See* 279 Or App at 422-23. Critically, the evidence at trial, and specifically Gabaldon's testimony, substantiated at least two temporally, spatially, and substantively distinct occurrences of such "abstain from engaging in" coercion: the first, when petitioner told the victims as they approached the Colemans' residence that, if they disclosed his conduct to the occupants and sought their assistance, he would kill the occupants (the Colemans); the second, after they had left the Colemans and were driving back to McMinnville, when petitioner told each of the victims that he would kill or injure them or their family members if they went to the police. *See* 279 Or App at 424-25. Given that evidence, it was at least abstractly possible that jurors could return a guilty verdict on Count 7, Count 8, or both, without concurring on the same predicate occurrence of coercion.[14]

In sum, constitutionally adequate counsel would have recognized that—contrary to trial counsel's proffered justification for not requesting a concurrence instruction—the evidence at trial did, in fact, disclose for Counts 7 and 8 multiple, separate occurrences of a crime, involving the same perpetrator and the same victim, charged in a single count. Counsel posited no other, tactical reason for not requesting such an instruction. Consequently, trial counsel's failure to request a concurrence instruction as to Counts 7 and 8 breached the standard of constitutionally adequate representation.

---

[14] As noted, 279 Or App at 425-26, the prosecutor explicitly referred to both of those occurrences in the state's closing argument.

We proceed, then, to the prejudice inquiry. Specifically, was there "more than [a] mere possibility but less than [a] probability" that the giving of a concurrence instruction could have affected the jury's guilty verdicts on Counts 7 and 8? *Ashkins*, albeit decided on direct appeal, informs that assessment.

In *Ashkins*, as noted, the Supreme Court concluded that the trial court had erroneously failed to give a requested concurrence instruction in circumstances generally analogous to those of petitioner's criminal trial. 357 Or at 659. The court began its consideration of prejudice by reiterating the generic appellate harmless error standard— that is, that a verdict must be affirmed if there is "'little likelihood that the error affected the verdict.'" *Id.* at 660 (quoting *State v. Hansen*, 304 Or 169, 180-81, 743 P2d 157 (1987)). The court then explained that, in cases of instructional error, specifically including such error involving jury concurrence instructions, an appellate court should assess putative prejudice (or the lack thereof) "in the context of the evidence and record at trial, including the parties' theories of the case with respect to the various charges and defenses at issue." *Ashkins*, 357 Or at 660. The court emphasized that "[s]uch a practical focus on the context of the entire record is a useful tool in instructional error cases." *Id.* at 661.

The Supreme Court then applied that practical, contextual approach in assessing whether there was "little likelihood" that a concurrence instruction, if given in *Ashkins*, would have affected the outcome there. In so doing, the court noted, particularly, that (1) the direct evidence on each charge "came almost exclusively" from the complainant; (2) the defendant's predominant, pervasive defense was that none of the alleged sexual conduct had ever occurred, and the charges had been maliciously prompted and fabricated by the complainant's mother and grandmother; and (3) "[n]othing about defendant's theory of defense concerned particular occurrences of the sexual acts described." *Id.* at 662. With respect to the latter circumstance, the court elaborated: "There was no alibi defense, nor any defense that [the victim] had misidentified the perpetrator. That is, nothing in the defense theory called into question [the

complainant's] description of any particular occurrence." *Id.* The court concluded:

> "In sum, there was evidence that defendant committed multiple acts of rape, sodomy, and unlawful sexual penetration against [the victim], but there was nothing to indicate that, in evaluating the evidence to determine if those offenses had been committed, the jury would have reached one conclusion as to some of the occurrences but a different conclusion as to others."

*Id.* at 662-63. The court accordingly concluded that the error in failing to give the jury concurrence instruction was harmless. *Id.* at 664.

We return to the assessment of prejudice in this case. We note at the outset that *Ashkins*'s practical, contextual approach to assessing prejudice is considerably more nuanced than the ostensibly categorical construct we applied in *Hale v. Belleque*, 258 Or App 587, 592-93, 312 P3d 533, *rev den*, 354 Or 597 (2013) (denying the state's petition for reconsideration of a determination that a petitioner was entitled to post-conviction relief based on his trial counsel's failure to request a jury concurrence instruction. *See Hale v. Belleque*, 255 Or App 653, 298 P3d 596 (2013)). Given *Ashkins*'s intervening guidance, we adhere to its method here, notwithstanding petitioner's invocation of *Hale*. To do otherwise, could create a potential incongruity in which a party who could not have prevailed on direct appeal if a concurrence instruction had been requested, but refused, could prevail in post-conviction relief if trial counsel failed to request such an instruction. *Cf. Horn v. Hill*, 180 Or App 139, 152, 41 P3d 1127 (2002) (noting that "[t]he analogy between error that is not 'harmless'" (on direct review) and "error that results in 'prejudice'" (for purposes of post-conviction relief) "appears to be useful, but it is for the Supreme Court to decide whether further elaboration * * * is necessary or desirable").

The state contends that the circumstances of the predicate criminal case here were so closely analogous to those in *Ashkins* that the latter is, effectively, conclusive as to a lack of cognizable prejudice from counsel's failure to request a concurrence instruction on Counts 7 and

8.[15] Specifically, the state contends that, just as in *Ashkins*, petitioner's criminal trial turned on a credibility dispute between a complainant (here, Gabaldon) and the defendant, and that here, as in *Ashkins*, the defense was generic and did not present a particularized defense as to either of the individual alleged factual scenarios (*e.g.*, the "Coleman" nondisclosure occurrence and the "police" nondisclosure occurrence). Accordingly, the state posits:

> "[N]othing in the defense theory called into question either of Gabaldon's separate descriptions of her two nondisclosures; rather, the defense theory was that Gabaldon's story regarding *all* of petitioner's alleged misconduct during the charged criminal episode was not credible. As a result, the jury's decision on Count 8 necessarily would have depended on their assessment of Gabaldon's overall credibility regarding all of the charges; the jury would not have parsed its consideration of the Count 8 coercion charge into a 'Colemans' piece and a 'police' piece."

(Emphasis in original; footnote omitted.) The state essentially reiterates that contention with respect to Count 7, involving Rife.[16]

We respectfully disagree. The practical premise of the state's position is that, because the jury necessarily found Gabaldon credible in convicting petitioner on all the other charges, individual jurors must have found her credible in *every* respect. Specifically, the state assumes, the requisite number of jurors must also have found Gabaldon credible with respect to the "Coleman" scenario alone or to the "police" scenario alone (and, more likely, both). Although

---

[15] *Ashkins* issued not only after the post-conviction court entered its judgment, but also after the appellate briefing and argument. We subsequently requested additional submissions from the parties addressing, *inter alia*, "whether, consistently with the analysis in *Ashkins*, * * * and given the totality of the criminal trial record, petitioner was congnizably prejudiced by trial counsel's failure to request a *Boots* instruction."

[16] The state forthrightly acknowledges one distinction between Count 7 and Count 8: Whereas, with respect to Count 8, Gabaldon testified that, because of petitioner's threats, she did not contact the police on May 27, there was no such evidence with respect to Rife (who, as noted, did not testify). Indeed, there was other evidence, pertaining to Rife's aunt's initial call to the police on the evening of May 27, from which, as the state acknowledges, "the jury reasonably could have inferred that Rife did *not* abstain from disclosing to the police." (Emphasis in original.)

that could well have been the deliberative dynamic, it is far from a "mere possibility" on the totality of the criminal trial record, *Green*, 357 Or at 322, that individual jurors were persuaded by Gabaldon's testimony as to one of the alleged incidents but not the other, or vice-versa, yielding an impermissible "mix-and-match" verdict on both Counts 7 and 8.

That is so because (unlike in *Ashkins*), there were potentially significant circumstantial and evidentiary distinctions between the two factual scenarios. For example, as noted, 279 Or App at 426, the Colemans testified at trial, and, on defense cross-examination, both testified that neither of the young women appeared at all distressed—and Ms. Coleman testified that the young women had ample opportunity to ask for her assistance without petitioner being able to interfere. From that testimony, individual jurors could reasonably draw diametrically different inferences—either that (as Gabaldon testified) the young women did not seek assistance because of petitioner's alleged threats to harm the Colemans, or that (as the defense contended) there had been no such threats. Further, with respect to nondisclosure to the police, some jurors could have found Gabaldon's account not persuasive, given that there was evidence from which a reasonable juror could find that Rife *did* seek police assistance on May 27, *see* 279 Or App at 435 n 16, and given the evidence that, when contacted by the police, Gabaldon, notwithstanding petitioner's alleged threats, did fully disclose petitioner's conduct. To be sure, Gabaldon's ultimate cooperation with the police investigation is by no means *necessarily* inconsistent with having abstained from initiating contact with the police because of threats by petitioner, but reasonable jurors could draw different inferences from those circumstances.

In sum, on this record, some jurors could, quite plausibly, have found Gabaldon's testimony persuasive beyond a reasonable doubt as to the Coleman nondisclosure factual scenario but not as to the police nondisclosure scenario, while other jurors could, quite plausibly, have found the obverse. Accordingly, there was "more than [a] mere possibility," *Green*, 357 Or at 322, that counsel's default in failing to request a concurrence instruction as to Counts 7 and 8 affected the guilty verdicts on those counts.

Reversed and remanded with instructions for post-conviction court to grant petitioner relief on Counts 7 and 8; otherwise affirmed.