Argued and submitted May 31; judgment of conviction for assault in the fourth degree constituting domestic violence reversed and remanded, otherwise affirmed October 23, 2019

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## SEAN PATRICK THERIAULT,
*Defendant-Appellant.*

Multnomah County Circuit Court
17CR03181; A165703

452 P3d 1051

Defendant appeals a judgment of conviction for fourth-degree assault constituting domestic violence. ORS 163.160; ORS 135.230. Defendant assigns error to the trial court's denial of his midtrial motion to require the state to elect which of his acts it was relying on to establish the elements of that crime, and the court's refusal to give a jury concurrence instruction. *Held*: Because the state charged defendant with one count of fourth-degree assault but presented evidence at trial of multiple separate acts by defendant that could constitute that crime, the trial court erred by failing to instruct the jury that the requisite number of jurors must agree on which act constituted the crime in order to find defendant guilty. The court's error was not harmless because, considering the evidence and record as a whole, jurors could have based their verdicts on different occurrences.

Judgment of conviction for assault in the fourth degree constituting domestic violence reversed and remanded; otherwise affirmed.

Jerry B. Hodson, Judge.

Eric Johansen, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Greg Rios, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

SHORR, J.

Judgment of conviction for assault in the fourth degree constituting domestic violence reversed and remanded; otherwise affirmed.

**SHORR, J.**

Defendant appeals from a judgment of conviction for fourth-degree assault constituting domestic violence. ORS 163.160; ORS 135.230. On appeal, defendant assigns error to both the trial court's denial of defendant's motion—made at trial—to require the state to elect which of defendant's acts it was relying on to establish the elements of that crime, and the trial court's refusal to give a "*Boots*" jury concurrence instruction. *See State v. Boots*, 308 Or 371, 376-79, 780 P2d 725 (1989), *cert den*, 510 US 1013 (1993) (explaining the importance of jury concurrence on the material elements of a crime). We conclude that, because the state charged defendant with one count of fourth-degree assault but presented evidence at trial of multiple separate acts by defendant that could constitute that crime, the trial court erred in denying defendant's requested jury concurrence instruction. Accordingly, we reverse and remand.

The state charged defendant with one count of strangulation constituting domestic violence, ORS 163.187, and one count of fourth-degree assault constituting domestic violence, ORS 163.160; ORS 135.230. The operative amended information broadly stated the elements of both crimes and stated that defendant committed those crimes on or about January 17, 2017. The amended information did not further allege the specific occurrences of those alleged crimes.

"In determining whether a concurrence instruction was required, we must consider all pertinent evidence admitted at trial." *State v. Slaviak*, 296 Or App 805, 806, 440 P3d 114 (2019). The facts underlying the assault charge occurred during a period of one to two hours. The state put on evidence that, during that time, defendant committed several acts that resulted in injuries to defendant's former girlfriend, E.

The following facts are taken from E's testimony at trial. E and defendant ended their relationship in early January, but E continued to stay with defendant at various friends' houses. E and defendant slept at a friend's apartment the night of January 16. The following day, after defendant's friends had left the apartment, E and defendant started

to argue. Defendant took E's phone and held it out of her reach. Defendant then "proceeded to push [E] down onto the ground." While on the ground or soon after she was pushed, E took defendant's wallet and threatened to throw the wallet over the apartment balcony unless defendant returned her phone. In response, defendant "grabbed [E] by the throat" and choked her "with one hand." E threw the wallet over the balcony, and defendant released E. Defendant left the apartment to find his wallet.

While defendant was outside locating his wallet, E locked the apartment door. When defendant returned, E let defendant back inside, still hoping that he would return her phone. As E opened the door, defendant "pushed his way into the door and pushed [E], and [she] fell on the floor." E recounted falling onto a baby's "bouncer chair" and hitting her "neck right on the side of it."

After E fell, she and defendant continued arguing, and E resumed her attempts to retrieve her phone. E testified that defendant blocked the door and refused to let E leave the apartment. At some point during the argument, E sat near the balcony door to smoke a cigarette. When E finished smoking, defendant pulled her "on top of him" by her neck. Defendant was lying on his back with "his arm around [her] neck *** strangling [her]" and holding her "[i]n a chokehold."

When defendant let go of E, she was able to take her phone from defendant's back pocket. E ran out the front door of the apartment and used her phone to call a friend. While E spoke to her friend on the phone, defendant followed her outside and ripped the phone from E's hand, cutting her nose with his fingernail.

Defendant returned to the apartment and E followed. When inside, E sat on the couch, while she and defendant continued to argue. At that point, a resident of the apartment, Booth, came home briefly, and E and defendant stopped arguing. Booth "was doing something in the kitchen," and he asked E what was going on. E responded that defendant had "just been throwing [her] around [the] apartment for the last hour." Booth "didn't really say anything" and left

the apartment. Defendant and E resumed arguing, and E was still seated on the couch when defendant approached the couch and held E down by the wrists. As defendant held her down, E "knock[ed] his glasses off his face" and "bent them in half." Defendant "got mad, really mad, and the next thing [E knew] he was punching [her] in the face and mouth." E testified that defendant hit E with his fist on the mouth once, and twice on her head, resulting in a cut lip, swelling, and bruising to her face, head, and forehead.

Now holding E by the forearms, defendant told E to find his glasses, and then released his grip. E positioned herself on the couch on her knees and looked behind the couch. Defendant "grabbed [her] off the couch and started choking [her]" for the third time. Again, defendant released E, who ran outside through the front door, where the residents of the apartment were waiting. The police arrived shortly thereafter.

Describing her injuries from that day, E testified that she "had head contusions, [her] neck was killing [her]," and "[her] entire body hurt." She attributed significant neck pain to hitting her neck on the baby furniture. When the prosecutor showed E photographs of her injuries, E noted bruising on her face and forehead, a cut on her lip, bruising on her ribcage, and redness on her neck. A bruise on her elbow came from "smacking [her] arm against the wall when [defendant] was choking [her] at one point," which E estimated was after defendant first took her phone. Other bruises on her arms and wrists were caused by defendant "grabbing [E's] wrists and holding [her] arms at certain points." When asked how long the bruising on her body lasted, E replied "about a week and a half."

A medical report from E's hospital visit that evening was admitted into evidence. Medical staff wrote that E was punched and elbowed in the head and face. The report contained several descriptions of injuries, including bruising to her face, head, and elbow, as well as "excoriations" to her neck.[1]

---

[1] The judge later instructed the jury that the term "excoriation" is defined as "one, the act of abrading or wearing off the skin, chafing and excoriation of the skin; two, a raw, irritated lesion."

The responding police officer, Hunzeker, also testi-
fied. During his testimony, Hunzeker recounted defendant's
description of the incident. Defendant told Hunzeker that
both he and E were "pushing and grabbing one another,"
and that "they both fell into the wall, and *** that's where
she hit her face." According to defendant, E later climbed on
defendant's back, so defendant "hip-tossed" E onto the couch.
At that point defendant "got on top of her on the couch,"
and "she grabbed his glasses and threw them behind the
couch." As they were "struggling on the couch," defendant
"accidentally hit [E] in the face with [his] hand." Defendant
also told Hunzeker that, when E tried to get away from
him, defendant "grabbed her by the arms" and "might have
caused her pain because he was so upset." Hunzeker testi-
fied that he noticed blood on defendant's knuckles but could
not identify the source. When Hunzeker later spoke to E,
she told Hunzeker that defendant "punched her two times in
the head and face" and put her in a headlock twice. During
that conversation, E complained of lip, nose, and head pain.
Hunzeker noticed redness and bruising on her head and a
cut on her lip. After additional interviews with two other
witnesses, Hunzeker's impression of the incident was that it
was not a "one hundred percent fight." In his view, "a fight
happened, there were some arguments," then "one [person]
came in and it stopped a little bit. He left and it went on a
little bit," then "the two [apartment residents] came in and
[the fight] stopped."

After the state's case-in-chief, defendant moved the
trial court to require the state to elect which of the alleged
acts and injuries the state would rely on as the basis for
the assault charge, to ensure the requisite number of
jurors agreed on the particular act constituting the crime.
Defendant also requested that the court instruct the jury
that the requisite number of jurors must agree on which act
constituted the crime in order to find defendant guilty of
assault. The court denied both motions. The jury convicted
defendant of assault but acquitted defendant of the strangu-
lation charge.

Defendant now appeals, assigning error to the trial
court's denial of defendant's motion to require the state
to elect and its failure to give defendant's requested jury

instruction. With respect to both assignments of error, defendant argues that the state charged defendant with one count of fourth-degree assault but presented evidence at trial that defendant committed several acts that could constitute that crime. Accordingly, defendant asserts that either the state was required to elect which act formed the basis for the assault charge or defendant was entitled to an instruction requiring the jury to concur as to that act. In response, the state contends that jury concurrence was not required in this case because defendant engaged in a single, ongoing course of conduct constituting assault, rather than multiple separate occurrences of the crime.

A trial court faced with meritorious motions for the state's election and a jury concurrence instruction must grant one or the other. *See State v. Ashkins*, 357 Or 642, 643, 357 P3d 490 (2015) (when the state charges a single crime, but the evidence is sufficient for the jury to find that there were multiple, separate occurrences of that crime, "the state *either* must elect which occurrence constituted the charged crime or, *alternatively*, the defendant is entitled to an instruction that ten or more jurors must concur on which occurrence constituted that crime" (emphases added)); *State v. Teagues*, 281 Or App 182, 189, 383 P3d 320 (2016) (when the state charges one count of a crime but the evidence at trial substantiates multiple separate occurrences of that crime, "the trial court must *either* require the state to elect the occurrence on which it will proceed *or* instruct the jury that the requisite number of jurors must agree on one of the multiple occurrences" (emphases added)). In prior cases where the defendant assigned error to the trial court's denial of both these motions, we have focused our analysis on the denial of the requested jury concurrence instruction. *See Teagues*, 281 Or App at 183 ("Because the trial court declined to require an election, it subsequently erred when it failed to instruct the jurors that they had to agree on the occurrence that constituted the assault.").

We follow that approach here, and address only defendant's second assignment of error, the trial court's denial of defendant's requested jury concurrence instruction.[2]

_____

[2] Additionally, we note that, under *State v. Payne (A163092)*, requiring the state to elect the basis for the crime in closing argument is an inadequate

Whether a trial court is required to give a particular jury instruction "is a question of law, which we review for legal error, viewing the evidence in support of the instruction in the light most favorable to [the party seeking the instruction]." *Id*. at 187.

"The right to jury concurrence arises from Article I, section 11, of the Oregon Constitution." *State v. Payne (A163092)*, 298 Or App 411, 421, 447 P3d 515 (2019). Under Article I, section 11, "to return a verdict of guilty, the requisite number of jurors must 'agree that the state has proved each legislatively defined element of a crime.'" *Mellerio v. Nooth*, 279 Or App 419, 429, 379 P3d 560 (2016), *rev den*, 361 Or 803 (2017) (quoting *State v. Pipkin*, 354 Or 513, 527, 316 P3d 255 (2013)). There are two situations when special measures may be necessary to ensure jury concurrence. "One situation occurs when a statute defines one crime but specifies alternative ways in which that crime can be committed." *Pipkin*, 354 Or at 516. The other situation occurs when the state charges a defendant with a single violation of a crime, "but the evidence permits the jury to find multiple, separate occurrences of that crime." *Id*. at 517. In the second situation, "the jury must concur as to which occurrence constitutes the offense." *Teagues*, 281 Or App at 193. In such cases, "a trial court has three primary tools at its disposal to ensure a jury bases its verdict on a discrete factual situation: a jury instruction, a statement of issues, or a verdict form." *Payne*, 298 Or App at 422.

This case presents the second situation. The evidence admitted at trial substantiated multiple acts that could constitute the crime of fourth-degree assault. Two recent cases, *Teagues* and *Slaviak*, are exemplary. In *Teagues*, the defendant was charged with one count of strangulation and one count of fourth-degree assault, but the state

_____

measure to ensure jury concurrence. 298 Or App 411, 422, 447 P3d 515 (2019) ("Because an *Ashkins* election exists to ensure jury concurrence, mere argument by the parties is insufficient to ensure that the jury only relied on certain evidence in reaching its verdict. To ensure the jury limits its consideration in the manner contemplated by the motion for election, the trial court needs to charge the jury in some manner."). We need not address that in our analysis, however, because we conclude that the trial court erred in denying defendant's requested jury concurrence instruction, and we reverse on that basis.

presented evidence of two separate occurrences of assault. 281 Or App at 183-84. The victim's roommate was the state's primary witness. He testified that he was awakened by sounds of the defendant and the victim arguing, and that shortly thereafter he heard a loud thud at the front door. The roommate heard more arguing but went back to sleep. Later that night, he was awakened again by the victim, who told the roommate that the defendant had choked her. The roommate observed that the victim's acrylic nails were broken, there was redness on the victim's neck, and she had a scrape on her knee. *Id*. at 184. According to the state, the defendant had committed assault either by pushing the victim and causing her to scrape her knee outside the front door of their house or by choking her inside their house later that night. Because the state's theories "were based on evidence of two different actions, which occurred at different times and in different locations and resulted in different injuries," the two occurrences were "'temporally, spatially, and substantively distinct,'" such that "they gave rise to different factual questions for the jury to resolve in order to determine whether the state had proven the elements of assault." *Id*. at 191 (quoting *Mellerio*, 279 Or App at 432).

In *Slaviak*, we again concluded that a jury concurrence instruction was required. 296 Or App at 806. In that case, the defendant was charged with two counts of first-degree sexual abuse. One count alleged that the defendant had unlawfully touched the victim's genital area, while the other alleged that the defendant had unlawfully touched the victim's breast. At trial, the victim testified that the defendant groped her in her bedroom, and then, after she pushed him away, the defendant followed the victim to the kitchen, where he groped her again. *Id*. at 806-07. During both incidents, the defendant touched the victim's genital area and breast. Therefore, the evidence admitted at trial would have allowed the jury to determine that the defendant had committed each count of sexual abuse in either the kitchen or the bedroom. Those two instances "were separated temporally and spatially" and presented as distinct occurrences, such that "different jurors could have voted to convict on each count based on different factual findings." *Id*. at 811.

Here, defendant was charged with one count of fourth-degree assault in violation of ORS 163.160(1)(a), which provides, in part, that "[a] person commits the crime of assault in the fourth degree if the person *** [i]ntentionally, knowingly or recklessly causes physical injury to another." That offense has three elements: "(1) a culpable mental state, (2) causation, and (3) physical injury." *Teagues*, 281 Or App at 188. The state may establish the "physical injury" element by proving either "impairment of physical condition or substantial pain." ORS 161.015(7).

At trial, E testified to various acts by defendant that caused her some form of injury. Several of those acts were "temporally, spatially, and substantively distinct." *Teagues*, 281 Or App at 191. That is, they occurred at different times, in different spaces, and were the cause of different injuries. We do not decide here whether all three of those factors must exist for a series of acts to constitute multiple, separate occurrences of a crime, but all three exist in the present case.

According to E, defendant punched her, strangled her, grabbed her by the wrists and arms, and pushed her into furniture. Those episodes of strangulation, the punches, and the pushing were separated by several temporal breaks. At least two of those breaks involved defendant or E leaving the apartment, and, during another, E and defendant were interrupted by a third party. And, as we understand E's testimony, it appears that there were several stretches of time, over one to two hours, when defendant and E were arguing, but not engaged in any physical encounter. As our cases demonstrate, to be "temporally distinct," multiple criminal occurrences need not be separated by lengthy periods of time nor by a complete cessation of the interaction between the defendant and the victim. For example, in *Slaviak*, the incidents in the kitchen and bedroom were separated only by the time required to walk between those rooms, and the defendant pursued the victim throughout. 296 Or App at 807. Similarly, in *Teagues*, the victim and the defendant argued with one another between the incidents of assault. 281 Or App at 184.

The occurrences of assault here were also "substantively distinct." Defendant's acts were the cause of a variety

of different injuries, including bruising and swelling to E's face and mouth, pain and excoriations to her neck, a bruised elbow, and bruising on her wrists and arms. As in *Teagues*, these injuries are not properly characterized as "a single injury or a cluster of injuries," but are distinct with respect to form and causation. *Id*. at 193.

Finally, defendant caused one injury here—the cut on E's nose—outside of the apartment and caused the other injuries inside, in various parts of the living room. Again, we note that both *Teagues* and *Slaviak* indicate that no significant spatial difference is required to conclude that separate criminal occurrences are "spatially distinct." Thus, although several of the underlying acts occurred in substantially the same location, that factor exists here as well.

Accordingly, the occurrences were sufficiently distinct to generate "different factual questions for the jury to resolve in order to determine whether the state had proven the elements of assault." *Id*. at 191. That is, to determine whether defendant was guilty of assault for punching E, the jury would have to determine whether defendant had in fact punched her, whether that action caused the cut on her lip, the bruising, the swelling to her face, or some combination of those injuries, and whether that constituted physical impairment or substantial pain. Those same factual questions would arise should the jury consider separate incidents of choking, pushing, and grabbing of E's wrists and arms. Because "different jurors could have voted to convict on each count based on different factual findings," a jury concurrence instruction was required. *Slaviak*, 296 Or App at 811.

In support of its argument that defendant was engaged in a single course of conduct, the state relies on *State v. White*, 115 Or App 104, 838 P2d 605 (1992), and *State v. Greeley*, 220 Or App 19, 184 P3d 1191 (2008). Both are distinguishable from the present case. In *White*, the defendant was charged with menacing after brandishing a flashlight and then a gun at his neighbor. 115 Or App at 106. The defendant argued that jury concurrence was required because either the defendant's act involving the gun or his

act involving the flashlight could have constituted menacing. We held that jury concurrence was not required, explaining that, because intent to place another person in fear is the "gravamen" of menacing, the state is not required to prove a single act to support a conviction for menacing. Rather, a defendant's entire course of conduct may be evidence of that defendant's intent to instill fear in the victim. 115 Or App at 107-08. In *Greeley*, the defendant was convicted of reckless driving. We explained that the defendant "could have committed several acts that, alternatively, constituted evidence of a single element—recklessness—in an episode of driving that lasted no more than four minutes." 220 Or App at 25-26. In each of those cases, the state relied on evidence of the defendants' separate acts as means of establishing a single element of the crime.

Here, evidence of the acts underlying the assault charge could not properly constitute alternative means of establishing a single element of the crime. As we have explained, the factual occurrence underlying the assault charge implicates factual questions relating to each element: defendant's mental state, the corresponding injury, and defendant's causation of that injury.

Lastly, we conclude that the trial court's error was not harmless. In criminal cases, a verdict may be affirmed, despite error, if there is "little likelihood that the error affected the verdict." *Ashkins*, 357 Or at 660. In determining whether a trial court's erroneous denial of requested jury instructions is harmless, "the court considers the instructions as a whole and in the context of the evidence and record at trial, including the parties' theories of the case with respect to the various charges and defenses at issue." *Id*. A court's erroneous failure to give a jury concurrence instruction is not harmless when "jurors could have based their verdicts on different occurrences." *Teagues*, 281 Or App at 194.

The state asserts that the trial court's error was harmless because the state focused on a single underlying occurrence—the punches—during its closing argument to the jury, thereby electing one theory of the assault. We

disagree for two reasons. First, we have recently expressed doubt that a state's voluntary election during closing argument is, on its own, an effective safeguard against jury nonconcurrence. *See Payne*, 298 Or App at 422 ("Because an *Ashkins* election exists to ensure jury concurrence, mere argument by the parties is insufficient to ensure that the jury only relied on certain evidence in reaching its verdict."). Second, even assuming that the state's closing argument could be a reason to consider the error here harmless, because the state repeatedly referred to E's pain, bruising, and excoriations to her neck as "injuries" during the trial, we are not persuaded that the state's argument was sufficiently clear to constitute an election. Although the state did narrow its focus in closing argument during a discussion of the "physical injury" element, it recounted several of E's other injuries at other points in its argument.

Considering the issue in the context of the evidence and record as a whole, jurors in this case "could have based their verdicts on different occurrences." *Teagues*, 281 Or App at 194. In *Ashkins*, the defendant was entitled to a concurrence instruction, but the trial court's error in denying the instruction was harmless. 357 Or at 664. In that case, the state's evidence regarding the underlying factual occurrences was almost exclusively undifferentiated and unspecific victim testimony, whereas the defense was a denial that any of the alleged crimes had occurred. Based on the evidence and the parties' theories, the Supreme Court concluded that the evidence did not suggest the jury might reach different conclusions as to different occurrences. That is, because the evidence was not specific, and the defense did not focus on refuting specific instances of the crime, the jury necessarily found the victim credible as to all the alleged occurrences. *Id.* at 662-63.

In contrast, in *Mellerio*, we concluded that the erroneous denial of a jury instruction was not harmless because, unlike in *Ashkins*, there were "circumstantial and evidentiary distinctions" between each of the factual occurrences at issue. 279 Or App at 436. There, the defendant was charged with, among other things, two counts of coercion pertaining

to two different victims. At trial, the evidence substantiated two instances of coercion for each count. According to the only testifying victim, the defendant compelled the victims to abstain from asking for help from the residents of a house and, later, disclosing the defendant's conduct to the police. *Id*. at 432. As to the first instance, the residents of the house testified that the victims did not appear concerned and that they had opportunity to ask for help outside of the defendant's presence. As to the second, there was evidence that the non-testifying victim did contact the police. We concluded that that evidence created instance-specific questions of credibility regarding the victim's testimony. As a result, there was more than a "mere possibility" that "individual jurors were persuaded by [the victim's] testimony as to one of the alleged incidents but not the other, or vice-versa, yielding an impermissible 'mix-and-match' verdict." *Id*. at 436.

The present case is more analogous to *Mellerio* than *Ashkins* in several respects. The defense here was particularized, as opposed to a sweeping denial of the allegations like that in *Ashkins*. Defendant focused on creating doubt with respect to specific incidents alleged by E, pointing out discrepancies between her testimony, the medical report, and the police officer's testimony. But defendant also highlighted evidence that corroborated E's account of certain injuries, like the medical report's inclusion of the excoriations to the neck, hematomas on the forehead, bruising on the elbow, and the fall into the baby furniture that caused pain in E's neck. And, as in *Mellerio*, some jurors could have been persuaded by E's testimony as to one incident, but not others, yielding a "mix-and-match" verdict. Both the medical report and Hunzeker's testimony could, at least potentially, support inferences that contradicted portions of E's testimony. Moreover, the jury acquitted defendant of the strangulation charge. While some jurors might have voted to acquit defendant of strangulation because they questioned E's testimony with respect to the choking, others may have been persuaded by E, but decided an instance of choking better supported a conviction for assault. Accordingly, we conclude that the trial court's erroneous denial of the jury concurrence instruction was not harmless.

Judgment of conviction for assault in the fourth degree constituting domestic violence reversed and remanded; otherwise affirmed.