742 August 20, 2025 No. 744

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRENT ALLEN BISSETT,
*Defendant-Appellant.*

Clackamas County Circuit Court
20CR12382; A180352

Thomas J. Rastetter, Judge.

Argued and submitted April 2, 2025.

Matthew Blythe, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

JOYCE, J.

Convictions on Counts 1 through 4 and 6 reversed and remanded; conviction on Count 5 remanded for resentencing; otherwise affirmed.

## JOYCE, J.

A jury convicted defendant of first-degree rape (Count 1), first-degree sodomy (Count 2), first-degree sexual abuse (Count 3), strangulation (Count 4), fourth-degree assault constituting domestic violence (Count 5), and menacing constituting domestic violence (Count 6).[1] In six assignments of error, defendant argues that the trial court erred in declining to instruct the jury regarding the state's election for each count because the jury heard evidence of criminal conduct that was not presented to the grand jury. We conclude that the trial court erred by declining to instruct the jury that it may only convict defendant based on the specific criminal acts the grand jury considered when it handed down the indictment, in violation of Article VII (Amended), section 5, of the Oregon Constitution. We further conclude that the error was not harmless as to the rape, sodomy, sexual abuse, strangulation, and menacing charges. The error was harmless, however, with respect to the assault charge. Accordingly, we reverse and remand on Counts 1 through 4 and 6; remand on Count 5 for resentencing; and otherwise affirm.

## I.   FACTS AND PROCEDURAL HISTORY

We begin with a brief overview of the facts and procedural history leading up to trial. Then, because they inform our analysis of the issues on appeal, we turn to a detailed discussion of the trial court's instructions to the jury, the parties' arguments and theories of the case, and the evidence presented at trial.

The charges arose after the complaining witness, K, reported that defendant had repeatedly sexually assaulted her after she went to defendant's house on December 29, 2019. A grand jury indicted defendant on various sexual offenses, strangulation, assault, and menacing. Before trial, defendant filed proposed jury instructions in which he noted that, "[i]n testifying before the grand jury, the complaining witness testified only to sexual contact that occurred in defendant's bedroom at night," but that "in various

---

[1] The trial court merged the verdict on the first-degree sexual abuse charge into the verdict on the first-degree rape charge.

interviews, the complaining witness alleged various sexual contact [that took place] both at night (pre-dawn) and in the morning." Defendant requested that "the jury be fully instructed as necessary to ensure that it considers only the charges brought by the grand jury." *See State v. Long*, 320 Or 361, 370 n 13, 885 P2d 696 (1994), *cert den*, 514 US 1087 (1995) (under Article VII (Amended), section 5, of the Oregon Constitution, a defendant has the "right to be tried only for the specific criminal act as to which the grand jury handed down the indictment").

At a pretrial hearing on the proposed jury instructions, defendant argued that, "when we're discussing election and concurrence, * * * the state is sort of bound to elect to rely on the assertions—I don't mean * * * word for word or anything like that—but the factual elements that make up the crimes in the trial need to be the same ones that were given to the grand jury." The state indicated that "in arguing the case" it would only "focus on those events that happened in the evening that were discussed at grand jury."

A.  *Preliminary Jury Instructions and Opening Arguments*

In its preliminary instructions, the trial court instructed the jury, among other things, that "[y]our duty is to decide the facts from the evidence. You and you alone are judges of the facts"; and "[t]he opening statements and closing arguments of the attorneys are intended to help you understand the evidence, although their statements and argument are not part of the evidence." In its opening argument, the state described the evidence and told the jury that "[K] will tell her story about how she was able to eventually get out of that house the morning of December 30th. But it was for the conduct that happened that night that the state has charged the defendant * * *."

In defendant's opening argument, defense counsel argued that defendant had a "sincere belief" that the sexual encounter was consensual. Defense counsel also stated that defendant "was extraordinarily drunk this evening * * * [a]nd [K] describes him going into the bathroom and peeing all over the floor because he was so intoxicated. And she doesn't use that opportunity, while he is in the bathroom, to

go and try to find her phone * * *. She goes into the bathroom to speak to him, and their encounter continues." Defense counsel told the jury that "you will have to assess [defendant's] state of mind, * * * [a]nd because his state of mind is that they were together for this consensual encounter, at the end of the case we will return and ask you to enter a verdict of not guilty on all counts."

B. *Evidence Presented at Trial*

After opening statements, the state called K to testify. K and defendant met in 2012 and began a sexual relationship that lasted a couple of months. They subsequently broke off the relationship but would periodically reconnect over text. In January 2019, defendant and K began texting regularly, including texts about sexual fantasies involving dominance and submission. In November 2019, K went to defendant's house, where they had a sexual encounter that did not involve any acts of domination or submission.

Defendant and K continued to text about sexual fantasies where K was submissive to defendant, including fantasies that involved "punishments, * * * humiliation, spanking." A little after midnight on December 29, 2019, defendant texted K, "Come here to get beaten and humiliated." K responded, "I'm already hurting on the inside. I want to feel physical pain too." Later that day K texted, "Do you think you could actually hit me?" Defendant responded, "No. Slap you maybe." Defendant asked K if she was going to come over that night and if she wanted him to hit her. K texted that the idea of him hitting her turned her on but that "I currently fear you too much in other ways to have that seriously be on the table right now. * * * So I think hitting would be too much right now." Defendant responded, "Bring us alcohol." A few hours later, K texted, "You still want me to come over?" Defendant replied, "You want to submit?" K texted, "Yes. Please be gentle? I'm not the strongest yet." Defendant replied, "Fuck you, slut." K responded, "I understand. Go on, please? Tell me what to do. In my car. On my way."

K arrived at defendant's house around 8:30 p.m. When K knocked on the door, defendant did not answer. K looked through the front window and saw defendant lying

on the couch. She tapped on the window, and defendant woke up, came to the door, and let her in. Defendant told K he was "drunky," hugged her, spun her around, grabbed her hair, and directed her to the bedroom. Over the next several hours, defendant repeatedly forced K's head down onto his penis, forced her into different positions by holding her jaw, vaginally penetrated her, and hit her on her face, breasts, stomach, and vagina. More than once, defendant smothered K with his groin, straddling her head and trying to keep her from taking a breath. While defendant was assaulting K, he made various verbal threats.

K told defendant over and over that it hurt and to stop, tried moving his hands off of her, and was "screaming," "crying," and "fighting him as best [she] could." At one point, K was able to get free of defendant, and he threw her on the bed with such force that her head hit the wall. After a while, K began to worry that defendant would kill her if she "pissed him off," and she tried to "just kind of like let it happen" and not fight him. Eventually defendant got up to go to the bathroom. K worried that defendant was getting a weapon, and she followed him to the bathroom. She stood in the doorway and saw him urinating. He noticed her standing there, turned around and started to walk towards her, but he was still urinating. She said, "You're still going." He charged at her, put his hand around her neck, grabbed her by the hair, and pushed her up against the wall, bashing her head against the wall. He turned her around and bashed her head against the opposite wall and choked her. Defendant then dragged K back to the bedroom.

Eventually, when it was "nearly dawn," defendant fell asleep and then woke up around 9:00 a.m. After he woke up, he was acting "fairly normal" and was not drunk anymore. Defendant asked K what happened last night, and she told him that he beat her. Defendant did not react or "show any remorse." Defendant and K were lying in bed, and defendant pushed K's mouth onto his penis. K testified that defendant "wouldn't have had to use a lot of force" to push her head onto his penis because "I was scared out of my mind. And I was doing anything, really, at that point, that he needed." K's mouth was swollen and sore, and she

"just couldn't \*\*\* do it." Defendant said, "[W]ow, you really are out of practice with that." Defendant turned K over onto all fours and vaginally penetrated her.

K told defendant that she had to leave at 10:00 a.m. After she got dressed, he walked her to the front door, gave her a kiss and a hug, and said, "I'll see you later." K went to her friend's house, and the friend took K to the hospital after K showed her the bruises and injuries and told her what had happened.

On cross-examination, defense counsel asked K about statements she made to investigators, including that defendant "was on the verge of passing out" when she arrived at his house, that he "was stumbling," and that when he went to the bathroom "he was swaying." Defense counsel asked K if she told a detective that, when defendant was vaginally penetrating her, he would ask her if she liked it, and she would tell him yes. K responded that she did say that. Defense counsel asked K why she did not "get to the front door" when defendant was in the bathroom, or why she did not grab her phone or defendant's phone when defendant was sleeping. K replied that she was "very, very scared." Defense counsel questioned K extensively about the text messages she and defendant exchanged about sexual fantasies and dominance and submission, and statements that K made to investigators about the texts.

Officer Orr testified on behalf of the state about an interview he conducted with K at the hospital. K recounted to Orr the details of the repeated assaults during the night. K told Orr that defendant told her, "You better get me off or I'm going to beat you to death." K told Orr that, when defendant went to the restroom during the night, "he appeared to sway back and forth as he was walking, showing that level of intoxication \*\*\*." K told Orr that, in the morning, defendant forced K to perform oral sex and that defendant forced his penis so far into her mouth that she was unable to breathe. K told defendant her mouth hurt, and defendant said, "Does it look like I care? Do what I say." K told Orr that she and defendant had sex three more times that morning; he testified that "it appeared like [K] was [saying] that the abuse had occurred three more times" in the morning.

Powell, the nurse who examined K at the hospital, also testified on behalf of the state. K told Powell that during the night defendant repeatedly forced her to have oral and vaginal sex, "suffocate[ed] [her] with his hand around [her] mouth and nose and laying on [her] with his body," and kept slapping and hitting her. K told Powell that defendant verbally threatened K, saying he "was going to beat [her] to death." K told Powell that defendant "was wasted and in the bathroom stumbling around." K told Powell that in the morning, they "woke up and there were three more sessions of suck off, fucking, [and] hitting. He saw the bruises on my breasts and said he really left a mark on me. He also made me tell him that I liked what he did to me." K reported her symptoms to Powell, including "difficulty swallowing and pain, *** memory loss, throat pain, nausea, *** [h]eadache, pain and tenderness in the neck area, swelling in the neck area, [and] uncontrolled shaking." Powell observed cuts inside of K's mouth and lip, an abrasion on her chin, bruises on her arms, legs, breasts, "pubic bone area," and abdomen, cuts on her nipples, and redness and swelling "in her external vaginal vulva area."

C.  *Defendant's Request for an Instruction from the Trial Court*

At the close of the evidentiary phase of the trial, defendant argued that "the Oregon Constitution requires the defendant to be convicted by a jury on the facts found by the grand jury" and thus he would be entitled to a motion for judgment of acquittal "on any vote to convict based on the morning allegations, because we know [K] did not testify [to the grand jury] about them or any alleged sexual misconduct in the morning, or menacing or strangulation or assault in the morning." The trial court asked, "Can we resolve this by simply—[the state is] going to make an election. Right? Does that resolve the issue?" Defendant replied that the way to resolve it would be to instruct the jury as to each charge that the offense occurred "in the nighttime." The court asked, "Are you suggesting that if I give your revision with the nighttime language, that we do not need *** a concurrence instruction?" Defendant replied that "[i]f you adopted in full our language, I don't think a concurrence instruction

would be necessary because they would be focused on the nighttime hours and they would need to agree."

The trial court stated that "using the language nighttime might be problematical *** if [the alleged conduct] continued into the early morning hours." Defendant explained that "the key point of distinction that needs to be made is that there was a break and then they woke up in the morning *** [a]nd it's that time, when they woke up in the morning, that was not mentioned before the grand jury."

The state told the trial court that "based on how the evidence came out *** I am going to make very clear in my closing argument I refer to it as predawn hours before the birds were chirping. And I will, when I'm going through the different counts, make that very clear to the jury, that the state has charged [defendant] *** for the conduct that happened before the morning, before 8:30 [a.m.]" The trial court asked defendant if that would "solve the problem," and defendant said he "would still like to have that clear from not just the state but the court. *** We believe that the verdict form or the instructions should also be clear to the jury that they must [focus on the right window of time]." The court declined to change any of the jury instructions, stating, "I don't think we need to change [the jury instructions]. Leave it."

D.   *Closing Arguments*

During its closing argument, the state reviewed each charge, beginning with first-degree rape. The state told the jury that the basis for that charge was "the acts that [K] endured from the evening time to predawn. The state is focusing you on what happened to her before the birds were chirping ***. We're talking about what happened at nighttime." The state told the jury that the basis for the first-degree rape charge was when defendant forcibly inserted his penis into K's vagina after she first arrived at his house, and he directed her into the bedroom.

The state again told the jury that "[f]or all of these charges we're focused on the actions that happened before dawn, from the evening to before those birds were chirping." The state told the jury that the first-degree sodomy charge

is based on "whether *** defendant grabbed [K's] hair by the handful and forced her down onto his penis, forced her down onto his penis so that her mouth was getting bruised each time he was thrusting inside of her." For the first-degree sexual abuse charge, the state told the jury that the "same facts that support rape in the first degree are also supporting" that charge.

At that point, the trial court interrupted the state and told the jury, "[Y]ou'll be getting written jury instructions with the elements the state has to prove, so if you get lost here, don't worry about it."

The state told the jury that the strangulation charge is based on "that moment when *** defendant sat his body weight on [K], when he covered her face with his genital area, and when she was struggling to breathe ***." The state did not specify a particular act for the assault charge but argued that "[K] suffered physical injury. You saw the photos. You saw the bruising. *** [Y]ou heard testimony that she required pain medication and that she was sore for days after this ***." For the menacing charge, the state told the jury "that *** defendant, while he was beating [K], said you're going to make me come or I'm going to beat you again. That statement, along with everything he was doing to [K] that night, is the basis for the menacing [charge] ***."

The state highlighted consistent statements that K made about the assault and argued that the injuries she sustained corroborated her account of events. The state mentioned that "[t]here was some evidence of intoxication," but argued that "you also need to consider what are some examples of *** where [defendant] was perceiving what was going on around him, because that tells you what was going on in his mind. He had control over [K]. *** [H]e knew what he wanted and he knew what he was doing."

In defendant's closing argument, defense counsel told the jury that, to find defendant guilty of the sex offenses, they would "have to find that the state proved beyond a reasonable doubt that in [the] nighttime hours, [defendant] was aware *** that [K] had withdrawn her consent." Defense

counsel told the jury that "it is [defendant's] state of mind that you will be focused on" and that defendant "believed that he and [K] were both coming together for a consensual encounter" that would involve "the infliction of emotional and physical pain on * * * [K]." In support of that argument, defense counsel pointed to the text messages between defendant and K about sexual fantasies involving dominance, submission, hitting, and humiliation; K's testimony that when defendant asked her during the encounter whether she liked it, she said yes; and defendant's actions in the morning of walking her to the door and kissing her.

Defendant also extensively argued that K was not credible because of "inconsistencies that we saw in the trial," including K's reluctance to acknowledge that, in statements to investigators she described defendant as "extremely intoxicated." Defense counsel highlighted other parts of K's testimony and argued that that testimony was inconsistent or not plausible, and that some of her testimony was not corroborated by the "medical evidence." In one reference to K's testimony, defense counsel said that the state "was clear that their allegations relate to the conduct that happened before they began to cuddle and [defendant] said I love you and they went to sleep. But in the morning she says they engaged in sex three more times."

Defense counsel also advanced a voluntary intoxication defense:

"[B]ecause the focus is on [defendant's] mental state * * *, the judge will instruct you that you can consider [defendant's] voluntary intoxication when determining what he knew. But up front, we will tell you, we're not saying that you can conclude that [K] was screaming at the top of her lungs, that [defendant] was bashing her head against the bathroom wall, the hallway walls, the bedroom wall repeatedly as she screamed for hours, as she testified, at the top of her lungs and that he was just too drunk to recognize that she had changed her mind. [K's] testimony about what occurred that night is not trustworthy evidence * * *. If you believe during [K's] testimony * * * that there was a miscommunication, intoxication is relevant because any such miscommunication on [defendant's] part, this evidence showed, would have been sincerely made."

E.   *Jury Instructions*

The trial court instructed the jury, in part, that

"[i]t is your sole responsibility to make all the decisions about the facts in this case. *** You are to base your verdict on the evidence and these instructions. The lawyers' arguments and statements are not evidence. If your recollection of the evidence is different from the lawyers' recollection, you must rely upon your own memory. In deciding this case, you are to consider all the evidence you find worthy of belief. *** Generally the testimony of any witness whom you believe is sufficient to prove any fact in dispute. *** The court will provide written instructions for your use. When you use these instructions, do not place any undue emphasis on any particular instruction but rather view the instructions as a whole. *** As jurors you have the sole responsibility to determine which testimony or portions of testimony you will or will not rely on in reaching your verdict."

The trial court further instructed the jury that, "[a]lthough the state must prove beyond a reasonable doubt that the crime occurred on or about the date alleged in the charge, the state does not have to prove that the crime occurred on the exact date alleged in the charge." The trial court instructed the jury on various mental states, including recklessness, and explained that "you may consider evidence of voluntary intoxication" in assessing whether defendant had the required mental state for offenses that allege either a knowing or intentional mental state. With respect to the fourth-degree assault charge, the trial court instructed the jury that a person commits that crime if the person "intentionally, knowingly, or recklessly causes physical injury to another."

The trial court instructed the jury on the elements of each charge, including that the state must prove that the act occurred "on or about December 29, 2019[.]" The trial court did not specify a factual basis for each charge but instructed the jury that "[a]ll 12 jurors must agree on a factual basis for each specific charge; therefore, as to each count, in order to reach a verdict of guilty on that count, all 12 members of the jury must agree on a specific instance of alleged conduct."

The jury found defendant guilty of all charges.

## II.  ANALYSIS

Under Article VII (Amended), section 5(3), of the Oregon Constitution, defendant has a right to be tried "only for the specific criminal act as to which the grand jury handed down the indictment." *Long*, 320 Or at 370 n 13. The state carries the burden of proving that the factual theory upon which the grand jury based its indictment was the same as that upon which the state tried its case. *State v. Samuel*, 289 Or App 618, 631-32, 410 P3d 275 (2017), *rev den*, 363 Or 104 (2018). A defendant is entitled to a judgment of acquittal to the extent that the "state fail[s] to carry its burden of proving that the grand jury found the facts upon which the state tried its case." *Id.*

Based on those principles, the parties below agreed that it would be impermissible for the jury to find defendant guilty based on evidence of the "morning" conduct, because that evidence was not presented to the grand jury. Defendant argued that, to prevent that outcome, the trial court was required to charge the jury through either an instruction or the verdict form that the offenses "occurred in the evening or nighttime hours." The trial court declined to charge the jury and ruled that the state's election during closing argument adequately addressed the issue.

On appeal, defendant renews his argument that the trial court's failure to charge the jury as to the state's election on each count violated his state constitutional right "to be tried only for the specific criminal act as to which the grand jury handed down the indictment." *Long*, 320 Or at 370 n 13. The state concedes that there was evidence that defendant committed the sexual offenses again in the morning, such that, in the absence of an instruction from the trial court, the jury could have convicted defendant based on conduct that was not presented to the grand jury. It argues, however, that we may not reverse based on that conceded error because it was harmless. The state also argues that the trial court did not err in failing to instruct on the strangulation, assault, or menacing charges, because "the victim did not describe any events the next morning" that could constitute those charges. As explained below, we accept the state's concession that the trial court erred with respect to

the sexual offenses. We further conclude that the trial court erred in failing to instruct the jury on the strangulation, assault, and menacing charges. Finally, we conclude that the error was not harmless with respect to all of the charges except the fourth-degree assault charge.

We review a trial court's failure to give a requested jury instruction for errors of law. *State v. Ashkins*, 357 Or 642, 648, 357 P3d 490 (2015). An instruction is proper if it "correctly states the law and is supported by evidence in the record, when the evidence is viewed in the light most favorable to the party requesting the instruction." *Id.*

In arguing that the trial court was required to charge the jury, defendant relies on *State v. Payne (A163092)*, 298 Or App 411, 413, 447 P3d 515 (2019), which involved the necessity of jury concurrence when an indictment "charges a single violation of a [statute defining a] crime but the evidence permits the jury to find multiple, separate occurrences of that crime." (Internal quotation marks omitted.). Although *Payne (A163092)* involved the state constitutional right to jury concurrence rather than the grand jury right, the issue implicated in that case is similarly implicated here—namely, the need to "ensure that the jury only relie[s] on certain evidence in reaching its verdict." *Id.* at 422.

Beginning with whether there was evidence from which the jury could have found defendant guilty of the charged crimes based on the morning conduct—an issue that was not disputed below—we conclude that there was. The state concedes that there was evidence that defendant committed the sexual offenses again in the morning, and we accept that concession. The state presented evidence that in the morning hours, defendant subjected K to vaginal and oral intercourse by means of forcible compulsion. *See* ORS 163.375 (outlining elements of first-degree rape); ORS 163.405 (outlining elements of first-degree sodomy); ORS 163.427 (outlining elements of first-degree sexual abuse). We further conclude that there was evidence from which the jury could have found defendant guilty of strangulation, fourth-degree assault, and menacing based on testimony from Orr and Powell regarding the morning conduct. *See* ORS 163.187 (outlining elements of strangulation); ORS

163.160 (outlining elements of fourth-degree assault); ORS 161.015(7) (defining physical injury).

Turning to the menacing charge, "[a] person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury." ORS 163.190(1). Because the "gravamen" of menacing is the intent to place another person in fear, a defendant's entire course of conduct may be evidence of that defendant's intent to instill fear in the victim. *State v. White*, 115 Or App 104, 107-08, 838 P2d 605 (1992). Here, when viewed in the light most favorable to defendant, and in the context of defendant's previous threats to and conduct towards K, the testimony about defendant's threats to and conduct towards K in the morning supported a reasonable inference that, in the morning, defendant, by word or conduct, intentionally attempted to place K in fear of serious physical injury. *See State v. Guerrero*, 331 Or App 384, 390, 545 P3d 1287 (2024) (evidence was sufficient to prove menacing where the defendant, without making implicit or explicit threats, assaulted and strangled the victim and attempted to leave the property with her to prevent property owner from being able to help her).

Because the jury could have convicted defendant of each crime based on the morning conduct, we must determine whether the state's election adequately ensured that the trial jury based its verdicts on only the nighttime conduct. We agree with defendant that, based on the principles outlined in *Payne (A163092)*, the state's election was not adequate. In *Payne (A163092)*, we observed that "mere argument by the parties is insufficient to ensure that the jury only relied on certain evidence in reaching its verdict" and concluded that "the trial court needs to charge the jury in some manner." 298 Or App at 422. Thus, as we recognized in *Payne (A163092)*, the state's election here in closing argument was insufficient, and the trial court erred in failing to charge the jury in some manner.[2] *Id.*

---

[2] We note that the wording that defendant proposed below—that the trial court include in the instructions for each charge that the offense occurred "in the nighttime"—might have confused the jury in light of the other instructions that the trial court gave. Thus, if the issue arises again on remand, we encourage the parties and the trial court to devise, as outlined in *Payne (A163092)*, an

Having concluded that the trial court erred in failing to instruct the jury as to the state's election for each charge, we next address whether the error was harmless. A verdict may be affirmed in a criminal case, despite error, if there is "little likelihood that the error affected the verdict." *Ashkins*, 357 Or at 660 (internal quotation marks omitted). In assessing the harmlessness of an instructional error, we consider "the instructions as a whole and in the context of the evidence and record at trial, including the parties' theories of the case with respect to the various charges and defenses at issue." *Id.* Defendant bears the burden to show that the court's error was not harmless.[3] *State v. Torres*, 206 Or App 436, 445, 136 P3d 1132 (2006).

Although we have not previously addressed harmless error in this context—where the trial court failed to instruct the jury to base its verdict only on conduct presented to the grand jury—our prior decisions concerning instructional error in jury concurrence cases provide guidance. In those cases, a "court's erroneous failure to give a jury concurrence instruction is not harmless when 'jurors could have based their verdicts on different occurrences.'" *State v. Theriault*, 300 Or App 243, 254, 452 P3d 1051 (2019). In other words, the error is not harmless if the evidence or defense created "instance-specific questions" such that "there was more than a 'mere possibility'" that individual jurors were persuaded by the evidence as to one of the alleged incidents but not the other, or vice-versa. *Id.* at 256. Conversely, if "there was nothing to indicate that, in

_____

appropriate communication to the jury that would ensure that the jury considers only the nighttime conduct in reaching its verdicts. 298 Or App at 422, 428 (indicating that a trial court has "three primary tools at its disposal to ensure a jury bases its verdict on a discrete factual situation: a jury instruction, a statement of issues, or a verdict form"; "[t]hose options are neither singular nor exclusive, and the cautious court might wisely utilize a combination of methods").

[3] Defendant argues that the trial court's error deprived him of his right to a grand jury indictment under the federal constitution and that, under the federal standard, the state has the burden to show that the error was harmless. Under controlling precedent of the United States Supreme Court, however, the grand jury process is not encompassed within the Fourteenth Amendment's requirement of due process. *See Hurtado v. California*, 110 US 516, 537-38, 4 S Ct 111, 28 L Ed 232 (1884); *see also State v. Newkirk*, 319 Or App 131, 134-35, 509 P3d 757, *rev den*, 370 Or 214 (2022) (discussing *Hurtado*). Thus, because the Due Process Clause of the Fourteenth Amendment does not incorporate the Grand Jury Clause of the Fifth Amendment, it is not applicable to the states.

evaluating the evidence \*\*\*, the jury would have reached one conclusion as to some of the occurrences but a different conclusion as to others," the error is harmless. *Ashkins*, 357 Or at 662-63. In those circumstances, there is little likelihood that, if the trial court had properly given the jury a concurrence instruction, the jury "would have reached a different result." *Id*. at 664; *State v. Camphouse*, 313 Or App 109, 116, 491 P3d 94, *adh'd to as modified on recons*, 316 Or App 278, 501 P3d 103 (2021), *rev den*, 369 Or 675 (2022) (concluding that the trial court's failure to give a concurrence instruction was harmless because there is little likelihood that, if the jury had been given the concurrence instruction, the jury would have reached a different result).

With those principles in mind, as explained below, we conclude that the error was not harmless with respect to the rape, sodomy, sexual abuse, strangulation, and menacing charges. Because defendant's voluntary intoxication defense does not apply to the fourth-degree assault charge, however, and as explained below, we conclude that the error was harmless as to that charge. ORS 161.125(2) (a voluntary intoxication defense is immaterial when "recklessness establishes an element of the offense").

The state argues that there is little likelihood that the jury would have misunderstood the basis for the charges because of the "nature of the testimony and the parties' express statements and arguments in closing about which course of conduct was the basis for the charges \*\*\*." In support of that argument, the state highlights that neither party referred to any morning sexual conduct in opening statements; K's testimony focused in detail on the nighttime conduct and only briefly discussed the morning conduct; and in closing arguments the parties emphasized that the charges were based on the nighttime conduct. The state also argues that defendant's primary defense was that K had consented, and nothing about that defense theory called into question K's description of any particular occurrence, as distinguished from any other occurrence. *See Ashkins*, 357 Or at 662 (concluding that the trial court's error was harmless in part because "nothing in the defense theory called into question \*\*\* any particular occurrence").

Defendant, in contrast, argues that his theory of defense was that (1) he was too intoxicated to form a knowing or intentional mental state, and that (2) he believed that K had consented, and that those defenses applied differently and more directly to the nighttime incidents than the morning incidents. Defendant points to evidence that defendant was extremely intoxicated when K arrived and continued to appear intoxicated throughout the night, whereas K testified that when defendant woke up in the morning, he "wasn't drunk anymore." Defendant also argues that, because K's injuries would have been visible in the morning and because K told defendant in the morning that he had beaten her, it was less plausible that defendant believed that K consented to the morning conduct.

We agree with defendant. First, although the state is correct that K's testimony about the morning conduct was brief, Orr and Powell also referred to the morning conduct in their testimony. From that testimony, the jury could have reasonably inferred that the nighttime abuse that K described in extensive detail occurred again in the morning.

Second, although the parties focused their arguments in opening and closing on the nighttime conduct, the trial court's instructions did not limit the jury to considering only the nighttime conduct. The court instructed the jury, as discussed above, that the "lawyers' arguments and statements are not evidence"; that "you are to consider all the evidence you find worthy of belief"; that "you have the sole responsibility to determine which testimony * * * you will or will not rely on in reaching your verdict"; and that "[y]ou are to base your verdict on the evidence and these instructions." Neither those nor any other instructions limited the jury to considering only the nighttime conduct. And the trial court further instructed the jury that "the state does not have to prove that the crime occurred on the exact date alleged in the charge."

Third, we agree with defendant that given the nature of his voluntary intoxication defense—which focused on his intoxication during the nighttime incidents as opposed to the morning incidents—it is possible that the jury could have been persuaded by that defense as to the nighttime

incidents but nonetheless found defendant guilty based on the morning incidents. We acknowledge that the voluntary intoxication defense was not defendant's primary defense theory—defendant mentioned it only briefly during closing argument. The vast majority of defendant's argument was that K was not a reliable witness and that, based on the texts and other communications from K, defendant believed that K consented to the conduct. Nevertheless, defendant's voluntary intoxication defense, which was supported by evidence in the record as to the nighttime conduct but not the morning conduct, distinguishes this case from cases where the courts have concluded that a trial court's failure to instruct the jury was harmless. *See Ashkins*, 357 Or at 662 (instructional error was harmless where defendant denied that any of the criminal acts occurred and argued that the complainant was not credible and that there was no physical evidence to support the charges); *Camphouse*, 313 Or App at 117 (instructional error was harmless where the "defendant did not distinguish individual dates or times and make specific arguments as to why the conditions on those dates fell short of violating the statute"; rather, the defendant made an undifferentiated denial that she committed any criminal conduct).

Thus, in assessing the error within the context of the parties' arguments, the court's instructions, and defendant's theory of the defense, we conclude that the trial court's error in failing to instruct the jury was not harmless with respect to the rape, sodomy, sexual abuse, strangulation, and menacing charges.

As noted above, however, defendant's voluntary intoxication defense, which refuted the state's evidence of defendant's mental state as to the nighttime conduct but not the morning conduct, does not apply to the fourth-degree assault charge. In the absence of that particularized defense, we are persuaded that there is little likelihood that the jury would have found defendant guilty on the assault charge based on the morning conduct but not the nighttime conduct. In other words, even if the trial court had properly instructed the jury to consider only the nighttime conduct, we conclude that there is little likelihood that "the

jury would have reached a different result" as to the assault charge. *Ashkins*, 357 Or at 664.

In *Ashkins*, for example, the Supreme Court concluded that evidence that the defendant had committed various sexual offenses against the victim did not suggest the jury might reach different conclusions as to different occurrences because the evidence was not specific, and the defense did not focus on refuting specific occurrences of the crime. 357 Or at 662-63. Here, because there was evidence that defendant assaulted K at night and in the morning, and there was nothing to indicate that the jury would have found defendant guilty based on the morning incidents but reached a different conclusion as to the nighttime incidents, the trial court's error in instructing the jury as to the assault charge was harmless. *See id.* (trial court's error in failing to give jury concurrence instruction was harmless where victim testified to multiple occurrences of each charged offense and "[n]othing about defendant's theory of defense concerned particular occurrences of the [crimes]" and thus "there was nothing to indicate that, in evaluating the evidence to determine if those offenses had been committed, the jury would have reached one conclusion as to some of the occurrences but a different conclusion as to others"); *cf. Theriault*, 300 Or App at 256 (trial court's erroneous denial of jury concurrence instruction was not harmless in prosecution for fourth-degree assault where defense was particularized and focused on creating doubt as to specific incidents).

Convictions on Counts 1 through 4 and 6 reversed and remanded; conviction on Count 5 remanded for resentencing; otherwise affirmed.